ANN CRAWFORD McCLURE, Chief Justice
This is a divorce case in which Appellant challenges only the trial court's findings concerning the property issues that arose at trial. For the reasons that follow, we affirm.
FACTUAL BACKGROUND
Appellant Kelly Morris Wheeling (Wife) and Appellee Everett Thomas Wheeling (Husband) were married on January 28, 1989, in Memphis, Tennessee. Husband and Wife had three children. All issues relating to the children were settled pretrial with a Rule 11 Agreement.
At the time of marriage, Husband worked at SMB Stage Lines loading and unloading cargo planes. All three of the parties' children were born between 1997 and 1999. Between 1998 and 2003, Husband changed jobs and companies twice. First, he became director of operations at Kitty Hawk Air Cargo and then the regional manager for Miami Aircraft Support (a/k/a Worldwide Flight Services). After Husband left Miami Aircraft Support, he became a consultant for Integrated Airline Services (IAS) and six months later, he worked his way up to become the vice president of sales and marketing. Throughout the duration of the marriage, Wife maintained the parties' home and took care of their three children.
In 2006, Husband signed an Executive Employment Agreement (the 2006 Agreement) with IAS and became its President, Chief Operating Officer (COO), and officer of any IAS affiliate. He received an annual salary of $200,000 with yearly increases and bonuses, but did not receive an ownership interest in IAS. The 2006 Agreement provided for a five-year term with a termination date of July 31, 2011. It also included a change of control bonus, which contemplated a two-percent bonus of the net proceeds earned over the five-year employment period, up to and including ten-percent, forgiveness of some debt, and a four-year covenant not to compete. In 2008, as part of the 2006 Agreement, IAS, as sole Member, together with Harry B. Combs, Jr. (Combs) and Husband, as the two Managers, signed the original operating agreement for an IAS subsidiary company, IAS Logistics DFW LLC (Logistics). Husband and Combs organized Logistics to fill a void left by another company that filed for bankruptcy. IAS performed a wide variety of services concerning air freight but lacked the trucking capabilities. As a result, Logistics was formed initially to move pallets at airports but later expanded to making local deliveries, too. Logistics and IAS shared operating facilities. As President and COO of IAS, Husband supervised Logistics, oversaw its operations and executed any management decisions. While Husband denied traveling on behalf of Logistics, his deposition indicated that he did travel for Logistics on occasion. According to Husband, he did not acquire an ownership interest in Logistics, *220 was not employed by Logistics, but he did use a company credit card for gasoline.
As of the date of trial, Logistics was not profitable. A couple of profit and loss statements were admitted at trial. The statement from 2013 indicated that Logistics had revenues of $8,127,683.86 but operated at a 4% loss, losing $332,636.06. Another statement for the end of 2013 provided a loss of only $50,333.00. Finally, a statement for the first two months of 2014 showed a loss of only $5,028.72 on gross receipts of $1,595,087.41.
In August 2011, Husband signed an amendment to the 2006 Agreement, which extended his employment from 2011 to July 31, 2016. In October 2011, Husband borrowed $75,000 from IAS and another $75,000 in December 2011 to maintain the parties' lifestyle. In January 2012, Husband and Wife separated. At that time, Husband was making an annual salary of $350,000. The parties had an understanding that Husband would continue to pay Wife's living expenses. Husband testified regarding the details of the arrangement: [Wife] and I had an understanding from the point in time in which we separated that I would take care of the expenses that she incurred, from a living standpoint, which is your home, her utilities, her automobiles, and all of the other related expenses that she had, as well as take care of the children.
We had an understanding as well that I would compensate her $5,000 a month so that she could use it for fuel, fun and food. [Wife] and I had a lot of understandings, and you're correct, I did make two separate bank accounts when those funds came in.
In February and May 2013, Husband borrowed another $50,000 and $8,000, respectively, from IAS to purchase a car for one of his sons' sixteenth birthday.
In July 2013, Cargo Airport Services (CAS) purchased IAS. Logistic was not included in the sale. Husband signed a new employment agreement with CAS (the 2013 Agreement), which superseded the 2006 Agreement, but it did not provide him with an ownership interest in CAS. Husband also signed a COO Bonus Agreement (Bonus Agreement), which addressed his change of control bonus referenced in the 2006 Agreement. In addition to the 2013 Agreement and Bonus Agreement, members of Logistics, including Husband, signed an Amended and Restated Operating Agreement (Amended and Restated Operating Agreement), which added new Members to Logistics. Five of the six Members were trusts associated with the Combs' family. Under the Amended and Restated Operating Agreement, the trusts owned 10,000 Units in Logistics and Husband owned 10,000 Units. As a result of IAS's sale to CAS, Husband received his change of control bonus discussed above, in the amount of $2,524,000 at the end of July 2013. However, the bonus was taxed as ordinary income and after paying income taxes in excess of $1 million, Husband netted approximately $1,442,292.56. Because of these tax consequences, Husband ultimately employed a tax avoidance device, known as Profits Interest Units (PIUs), and acquired his 10,000 Units in Logistics as PIUs also at the end of July 2013. PIUs are equity ownership interests governed, for tax-treatment purposes, by the Internal Revenue Code, 26 U.S.C. § 83. PIUs are acquired by the rendition of services rather than by capital contributions. Revenue 93-27 clarified the tax treatment of the receipt of a PIU, which may or may not be a taxable event depending on whether the provisions of the safe harbor apply. The safe harbor provides the receipt of such PIUs is not a taxable event so long as (1) the PIUs do *221 not relate to a substantially certain and predictable stream of income from partnership assets, such as income from high-quality debt securities or high-quality net least; (2) the partner does not dispose of the PIUs within two years of receipt; and (3) the PIUs are not a limited-partnership interest in a "publicly traded partnership" within the meaning of Section 7704(b) of the Internal Revenue Code. Provided that Husband met the above requirements, in addition to the non-transferable provision contained in the Amended and Restated Operating Agreement, monies received as a result of Husband's interest in Logistics would be taxed at a capital gains rate rather than at the substantially higher rates for individual income taxes. The other five Members of Logistics made capital contributions in exchange for their 10,000 Units, totaling $932,917.00. In August 2013, Wife filed her petition for divorce. She later supplemented her petition to add claims for breach of fiduciary duty, actual fraud, constructive fraud, and waste of assets. Husband denied any act of actual or constructive fraud and contended that Wife's claims were "estopped by her own bad acts and fraud on the community." In September 2013, the parties agreed that $175,000 would be disbursed to each of them for the purpose of purchasing their own respective homes. In October 2013, Wife approached Husband and requested an additional $325,000 for the purchase her home.
In January 2014, pursuant to the 2013 Agreement with CAS, which was terminable on 30 days' notice and contained a 12-month do-not-compete provision, save and except for Logistics, Husband began working for CAS as the Executive Vice President of Sales and Business Development, receiving a reduced annual salary of $200,000. In June 2014, CAS terminated Husband's employment and advised him of CAS's intent to enforce its covenant not to compete provision. In September 2014, the trial court issued its rendition and in October 2014, it signed its final judgment, which incorporated its rendition, the parties' Rule 11 Agreement relating to the children of the marriage, the distribution of the proceeds from the sale of the marital residence, and an advancement of $25,000 to Wife to partially pay her attorney's fees. In December 2014, the trial court issued its Findings of Fact and Conclusions of Law.
Waste Claims at Trial
At trial, Wife introduced into evidence several summaries of Husband's expenditures, accompanied by credit card and bank statements that she alleged to constitute waste. The summaries tallied Husband's expenses on trips, gifts, restaurants, clothing, flowers, guns and ammunition, alcohol, spas, golf, and furniture during the two-year period the parties were separated. During this same two-year period, Wife also provided documentation of Husband's ATM withdrawals, in which he received cash back when making purchases. This total included gifts to Husband's paramour, Elizabeth Brown, whom he began dating in Spring 2012, as well as a trip the two took together to Hawaii in August 2013. Husband introduced into evidence his own summaries which accounted for the expenditures that Wife claimed he wasted, most of which were attributable to his employment and the maintenance of the community estate.
After the parties separated, Wife also began dating. She met Kevin Kirkwood and Husband claimed that Wife spent money on food, entertainment, and numerous vacations both in and outside of Texas with Kirkwood, also constituting waste. Husband also claimed at trial that Wife wasted community funds on staying in *222 shape. Wife also admitted to spending every penny Husband gave her during their separation. Husband was particularly upset with the time Kirkwood spent with Wife at the marital residence. Kirkwood had allegedly used the basketball court, the internet in the home office, the outdoor grill and drove one of Husband's cars. Wife points out one instance during trial where Husband claimed that every time Kirkwood cooked burgers on the outdoor grill, it cost the community estate $1,500. Husband also testified that he considered it wasteful that Wife failed to rehabilitate and educate herself while they were separated.
The trial court made the following Finding of Fact concerning the parties' waste claims against each other:
During the marriage, each party committed waste and each party's waste is offset and otherwise negated by the other party's waste.
Valuation of Logistics at Trial
At trial, the parties disputed the value of Husband's PIUs. Husband insisted that the PIUs had a liquidation value of zero while Wife asserted that they were worth more, but was unable to specify an exact amount.
Husband repeatedly testified that he never acquired any ownership or equity interest in Logistics, but was a Member of Logistics and owned 10,000 PIUs. He also reiterated that he was one of the two Logistics' Managers, just as he had been at Logistics' organization.
The 2013 Agreement with CAS contained a non-compete clause. However, the clause made an exception should Husband decide to leave and work for Logistics. Husband testified that Combs gave him the PIUs to manage and run the business in the future to protect the Combs family's investment. Husband relayed at trial that he never provided Logistics with any services because he was not an employee of Logistics. It was his understanding that his PIUs were given to him in expectation for future services to Logistics and that in order for the PIUs to have any value, he had to work for Logistics. Husband further testified that if he did not remain employed by Logistics for at least two years, then he would lose the preferential tax treatment afforded by the PIUs. Finally, he indicated that if he transferred the PIUs to anyone, including Wife, he would also lose the tax benefits of the PIUs. Moreover, the record also reflects that the Amended and Restated Operating Agreement required a member, like Husband, to execute a counterpart agreement or a document in writing accepting the grant of the PIUs and this document must then also be signed by the company thereby acknowledging the acceptance. Husband testified that he never executed such a document. Additionally, Logistics never received a counterpart agreement document relating to the issuance of Husband's PIUs. In short, no type of documentation was ever created to verify or confirm that Husband was issued the PIUs. Finally, Logistics was also required to report the issuance and receipt of Husband's PIUs and Husband testified that he never received a report by way of a W-2, 1099, or other similar document.
The trial court ultimately found that during the marriage, Wife and Husband acquired one hundred percent (100%) of the Profits Interests Units in Logistics valued at $0.00. Wife now appeals these two findings.
DISCUSSION
In her first two issues on appeal, Wife argues there is no evidence or insufficient evidence, to support the trial court's findings *223 of fact that (1) she committed waste and that Husband's waste offset and otherwise negated her waste; and (2) that the PIUs were valued at $0.00. Her third issue cumulatively addresses the harm that occurred as a result of her first two issues. Instead of addressing the harm analysis separately as a third issue, we will conduct a harm analysis for each of Wife's two respective issues.
Standard of Review
Legal Sufficiency
A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. Serrano v. Union Planters Bank, N.A. , 162 S.W.3d 576, 579 (Tex.App.-El Paso 2004, pet. denied). There are two separate "no evidence" claims." Id. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." Id. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." Id. ; In re Estate of Livingston , 999 S.W.2d 874, 876 (Tex.App.-El Paso 1999, no pet.). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005) ; El Paso Independent School District v. Pabon , 214 S.W.3d 37, 41 (Tex.App-El Paso 2006, no pet.).
In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. City of Keller , 168 S.W.3d at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. Id. at 821. But if the evidence allows for one inference to be made, neither the trier of fact nor the reviewing court may disregard it. Id. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. Id. at 819. When conflicting evidence exists, it is within the province of the trier of fact to resolve such conflicts. Id. at 820. In circumstances in which a reasonable trier of fact could resolve conflicting evidence either way, we, as the reviewing court, must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in our sufficiency review. Id. at 821. Moreover, if the evidence admitted at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. Id. at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the trier of fact. Id. The ultimate test for legal sufficiency is whether the evidence at trial would enable a reasonable and fair-minded people to reach the verdict under review. Id. at 827.
Factual Sufficiency
"Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. Tate v. Tate , 55 S.W.3d 1, 5 (Tex.App.-El Paso 2000, no pet.). When the party having the burden of proof complains of an unfavorable finding, the *224 point of error should allege that the findings "are against the great weight and preponderance of the evidence." Id. The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings. Kimsey v. Kimsey , 965 S.W.2d 690, 700 (Tex.App.-El Paso 1998, pet. denied) ; Neily v. Aaron , 724 S.W.2d 908, 913 (Tex.App.-Fort Worth 1987, no writ).
Abuse of Discretion
An appeal directed toward demonstrating an abuse of discretion is one of the tougher appellate propositions. Tate , 55 S.W.3d at 5. Most appealable issues in family law are evaluated against an abuse of discretion standard, be it the issue of property division incident to divorce or partition, conservatorship, visitation, or child support. Id. at 5-6. While an appellant may challenge the sufficiency of the evidence to support a trial court's findings of fact, in most circumstances, that is not enough. Id. at 6. If, for example, an appellant is challenging the sufficiency of the evidence to support the trial court's valuation of a particular asset, he must also contend that the erroneous valuation caused the court to abuse its discretion in the overall division of the community estate.[1] Id. Accordingly, we must also determine whether the errors of which Wife complains of on appeal, if established, caused the trial court to abuse its discretion. Id. These two prongs require first, a showing of error, and second, a showing that the error was harmful. TEX.R.APP.P. 44.1(a)(1) (no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of probably caused the rendition of an improper judgment). In other words, for example, Wife's argument should be that because of the trial court's valuation error, the size of the community pie was underestimated; as a result, the division of the community estate was manifestly unjust and Wife was served too small a slice. Tate , 55 S.W.3d at 6.
WASTE CLAIM
In her first issue, Wife complains that the trial court erred in finding that she *225 committed waste and that Husband's waste offset and otherwise negated her waste. She asserts that there is no evidence, or insufficient evidence, to support the trial court's findings. We disagree.
The Texas Supreme Court has recognized waste of community assets as a factor to be taken into consideration in the division of the community estate. Loaiza v. Loaiza , 130 S.W.3d 894, 900 (Tex.App.-Fort Worth 2004, no pet.) ; Schlueter v. Schlueter , 975 S.W.2d 584, 589 (Tex. 1998) ; see also Harper v. Harper , 8 S.W.3d 782, 783-84 (Tex.App.-Fort Worth 1999, pet. denied). A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse. In re Marriage of Moore , 890 S.W.2d 821, 827 (Tex.App.-Amarillo 1994, no writ). The breach of a legal or equitable duty which violates this fiduciary relationship existing between spouses is termed "fraud on the community," a judicially created concept based on the theory of constructive fraud. Id. Any such conduct in the marital relationship is termed fraud on the community because, although not actually fraudulent, it has all the consequences and legal effects of actual fraud in that such conduct tends to deceive the other spouse or violate confidences that exist as a result of the marriage. Id.
A presumption of constructive fraud arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. Zieba v. Martin , 928 S.W.2d 782, 789 (Tex.App.-Houston [14th Dist.] 1996, no writ) ; Jackson v. Smith , 703 S.W.2d 791, 795 (Tex.App.-Dallas 1985, no writ). When that occurs, the burden of proof is on the disposing party to show fairness in disposing of community assets. Zieba , 928 S.W.2d at 789 ; Morrison v. Morrison , 713 S.W.2d 377, 379 (Tex.App.-Dallas 1986, writ dism'd) ; Horlock v. Horlock , 533 S.W.2d 52, 55 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ dism'd w.o.j.). The court may consider three factors in considering a claim of constructive fraud: (1) the size of the gift in relation to the total size of the community estate; (2) the adequacy of the remaining estate; and (3) the relationship of the parties involved in the transaction. Puntarelli v. Peterson , 405 S.W.3d 131, 137-38 (Tex.App.-Houston [1st Dist.] 2013, no pet.) ; Zieba , 928 S.W.2d at 789, citing Horlock , 533 S.W.2d at 55.
Evidence of a spouse using excessive funds without the other spouse's consent supports a waste finding. Graves v. Tomlinson , 329 S.W.3d 128 151 (Tex.App.-Houston [14th Dist.] 2010, pet. denied) (waste found where excessive attorney's fees were incurred during divorce proceedings). Expenditures for the benefit of a paramour also establish waste. Loaiza , 130 S.W.3d at 902. Further, while waste claims are often premised on specific transfers or gifts of community property to a third party, a waste judgment can also be sustained by evidence of community funds unaccounted for by the spouse in control of those funds. Puntarelli , 405 S.W.3d at 139. For example, in Murff v. Murff , the Supreme Court held that the trial court did not abuse its discretion in awarding wife a money judgment, given there was evidence that "husband had substantial sums in savings before the separation that had disappeared by the time of trial." 615 S.W.2d 696, 699 (Tex. 1981). Similarly, in Massey v. Massey , the court affirmed a jury's finding of constructive fraud on the community, holding that the finding was supported by evidence of significant depletion of community cash by appellant that appellee had no information about, and by evidence that the appellant "failed to account for significant sums of *226 money paid to the community or borrowed against the community's assets." 807 S.W.2d 391 402-03 (Tex.App.-Houston [1st Dist.] 1991, writ denied).
Other courts of appeals have likewise affirmed waste judgments that were not based on disputes over a specific gift of community assets, but instead based in whole or in part on the failure of the dissipating party to account for community funds in that party's control. Zieba , 928 S.W.2d at 789-90 (holding trial court erred in failing to find, as a matter of law, that husband breached fiduciary duty by "no properly accounting for the withdrawal of community funds, wasting community funds or spending community funds without [wife's] knowledge or consent" during the pendency of the divorce proceedings); Reaney v. Reaney , 505 S.W.2d 338, 340 (Tex.App.-Dallas 1974, no writ) (affirming disproportionate community division and money judgment in wife's favor where husband claimed to have spent $53,000 in community funds in the six months shortly before trial and "utterly failed to make any showing that the loss and dissipation of these community funds was not an abuse of his managerial powers" when the "burden was on him to do so.").
At trial, Wife supported her contentions that Husband committed waste with several summaries of Husband's expenditures during their separation. She utilized these summaries to show (1) significant funds unaccounted for by Husband; (2) trips taken by Husband and his paramour, Elizabeth Brown; (3) gifts to Elizabeth; and (4) business expenses. Husband controverted and rebutted these claims by accounting for the expenditures, most of which he testified were attributable to his employment and the maintenance of the community property.
Husband supported his claim that Wife committed waste by presenting evidence at trial: (1) that Wife never made an effort during the parties' separation to support herself financially; (2) relatedly, she never sought out any job opportunities or formulated a plan for obtaining a job in the future; (3) Wife admitted spending every penny provided to her by Husband during their separation; (4) Wife, like Husband, spent community funds on her paramour, Kevin Kirkwood, which included gifts such as clothing, jewelry, and cash; (5) Wife and Kirkwood, like Husband, similarly went on several trips both in and out of Texas; (6) Kirkwood spent time at the marital residence, used cars owned by the community, the entertainment system, the internet, and the outdoor kitchen, all without Husband's consent; and (7) in September 2013, the parties agreed to a disbursement that provided each of them with $175,000 to purchase their own separate homes, however, Wife approached Husband in October 2013 and asked for an additional $325,000 for the purchase of her home. And finally, despite their agreement that Husband would continue to provide for Wife and the children during their separation, Wife regularly overdrew her bank account, which caused her to incur bank fees and subsequently led to Husband routinely transferring additional funds into her account.
Obviously, the parties presented conflicting evidence in an attempt to prove their waste claims. An appellate court will not disturb a trial court's findings of fact where there is some evidence in the record to support them. Zieba , 928 S.W.2d at 787 (an abuse of discretion does not occur where the trial court bases its decision on conflicting evidence or where some evidence of a substantial and probative character exists to support the trial court's division); Wood v. O'Donnell , 894 S.W.2d 555, 557 (Tex.App.-Fort Worth 1995, no writ) ; D.R. v. J.A.R. , 894 S.W.2d 91, 95 (Tex.App.-Fort Worth 1995, writ denied) ;
*227 National Bond and Inv. Co. v. Atkinson , 254 S.W.2d 885, 887 (Tex.Civ.App.-Amarillo 1952, writ dism'd). Where there is probative evidence to support the findings, they are binding on the reviewing court even if there is conflicting evidence suggesting different conclusions. Aerospatiale Helicopter Corp. v. Universal Health Serv. Inc. , 778 S.W.2d 492, 498 (Tex.App.-Dallas 1989, writ denied), cert. denied , 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 115 (1990). Moreover, as the trier of fact, it was the role of the trial court to judge the credibility of the witnesses, weigh the testimony, accept or reject any testimony, and resolve conflicts in the evidence. In re Marriage of C.A.S. and D.P.S. , 405 S.W.3d 373, 390 (Tex.App.-Dallas 2013, no pet.) (we "will not disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence"); see also Murff , 615 S.W.2d at 700.
Viewing the evidence in the light most favorable to the verdict, the above evidence was sufficient to establish that both Husband and Wife similarly disposed of community property during the parties' separation. After considering the evidence before the court, we do not think it is indicative of the one-sided nature-that Husband solely committed all of the waste and Wife committed none-as Wife's brief would have us believe. We agree with Husband that the trial court could have reasonably determined that Wife's excessive spending as well as her spending of community property funds on similar trips and gifts, some of which were for Kirkwood, sufficiently support the trial court's finding that Wife also committed waste. Dow Chemical Co. v. Francis , 46 S.W.3d 237, 242 (Tex. 2001).
Even if we were to determine that the trial court erred in its determination that both parties committed waste, Wife still has the burden to show that the alleged error caused the trial court to abuse its discretion in the overall division of the community estate, essentially showing that the error was harmful. Tate , 55 S.W.3d at 5 ; TEX.R.APP.P. 44.1(a)(1). Here, we cannot say that Wife has met this burden. Wife has not demonstrated that the trial court's decision to offset each party's waste resulted in an inequitable division of the estate, especially considering the evidence that Wife received half of Husband's change of control bonus, Husband continued to pay for Wife's expenses during their separation, and Wife was ultimately awarded 60% of the checking and savings accounts. We may not disturb the TC's division absent a clear abuse of discretion. Stafford v. Stafford , 726 S.W.2d 14, 16 (Tex. 1987).
More importantly, the findings of fact in this instance did not include the waste values attributed to either party. Without this information, we cannot know the value of waste each party committed relative to the entire community property estate, only that each party's waste negated the other party's waste. Accordingly, Wife cannot show that this error, if any, had more than a de minimis effect on the just and right division of the community estate. In other words, even if we determined that Wife was correct in her assertion that the trial court erred in finding that she committed waste she nonetheless failed to establish that such an error probably caused the rendition of an improper judgment. Pace v. Pace , 160 S.W.3d 706, 716 (Tex.App.-Dallas 2005, pet. denied). We overrule Issue One.
VALUATION OF HUSBAND'S PROFITS INTEREST UNITS
In her second issue, Wife contends that there was no evidence, or insufficient evidence, to support the trial court's $0.00 *228 valuation of Husband's PIUs. We find Wife's argument without merit.
The value of community assets is generally determined at the date of divorce or as close to it as possible. Handley v. Handley , 122 S.W.3d 904, 908 (Tex.App.-Corpus Christi 2003, no pet.) ; Grossnickle v. Grossnickle , 935 S.W.2d 830, 837 (Tex.App.-Texarkana 1996, writ denied). However, nearness in time is a matter left to the discretion of the trial court. Finch v. Finch , 825 S.W.2d 218, 223 (Tex.App.-Houston [1st Dist.] 1992, no writ) (trial court did not abuse its discretion by considering land appraisal made one year earlier in dividing real estate on date of divorce); see also Quijano v. Quijano , 347 S.W.3d 345, 349-50 (Tex.App.-Houston [14th Dist.] 2011, no pet.) (trial court did not abuse its discretion by considering six-month-old statement to assess value of checking account when that was the best evidence of record concerning value of account).
Generally, a party who does not provide to the trial court any value for the property cannot, on appeal, complain of the trial court's lack of information in dividing the community estate. Todd v. Todd , 173 S.W.3d 126, 129 (Tex.App.-Fort Worth 2005, pet. denied) ; Deltuva v. Deltuva , 113 S.W.3d 882, 887 (Tex.App.-Dallas 2003, no pet.) (op. on reh'g); Sereno v. Sereno , No. 13-08-00691-CV, 2010 WL 5541709, at *2 (Tex.App.-Corpus Christ Dec. 30, 2010, no pet.) (mem. op.); Vannerson v. Vannerson , 857 S.W.2d 659, 670 (Tex.App.-Houston [1st Dist.] 1993, writ denied) ; see also LeBlanc v. LeBlanc , 761 S.W.2d 450, 453 (Tex.App.-Corpus Christi 1988), aff'd , 778 S.W.2d 865 (Tex. 1989) (holding that where an appellant fails to provide values on any of the property to the trial court, he cannot on appeal complain of the trial court's lack of complete information in dividing [or valuing] that property).
The trial court characterized Husband's PIUs as community property, valued them at $0.00, and awarded them to Husband. Wife argues that the $0.00 valuation was presumably based on Exhibit B to the Amended and Restated Operating Agreement, which showed the capital contributions to Logistics as the liquidation value of the PIUs should Logistics undergo liquidation. However, the Amended and Restated Operating Agreement specifically provides that Exhibit B is to be used for illustrative purposes only "and shall not be deemed conclusive evidence of the then-current identification of the Members of the Company or the then-current Unit holdings of the Members." Moreover, Wife's conclusive and unsupported contention that there is "strong evidence" that Husband's 10,000 PIUs in Logistics are worth the same amount that the Combs' family trust invested (approximately $932,917), has no support in the record and is unfounded. Even if Husband were entitled to receive some type of distribution of the PIUs, Wife concedes that members of the Combs family, who made capital contributions toward Logistics, were required to be repaid first before Husband would be entitled to any distribution. Additionally, the record reveals that as of the date of trial, Husband was not a Logistics employee; he had not provided any services to Logistics; no documents exhibiting ownership were ever executed or issued regarding the PIUs; and the required counterpart documents were neither created nor acknowledged by Logistics as required by the Amended and Restated Operating Agreement. All of this evidence supports the trial court's determination that the PIUs had a value of $0.00 at the time of divorce. There is no evidence to the contrary suggesting that the PIUs had any *229 value other than $0.00. Wife had a responsibility to produce evidence of an alternative value of the PIUs and failed to avail herself of that opportunity. Sereno , 2010 WL 5541709, at *3 ; Vannerson , 857 S.W.2d at 670.
Wife further relies on Husband's testimony at trial that he was unable to predict how much money Logistics would make in the future. She utilizes this testimony to make the argument that if the trial court believed Husband, then it should have divided the PIUs between the parties on an if, as and when basis, as the courts typically do when an asset cannot be valued. Cearley v. Cearley , 544 S.W.2d 661 (Tex. 1976). Wife's reliance on Cearley , however, is misplaced. The Cearley court addressed the division of a husband's interest in his future military pension benefits. Id. at 663. While his retirement benefits had not yet vested at the time of the divorce, the husband had nonetheless invested twenty-four years of effort toward his future interest in the pension during the marriage. Id. at 664. The husband argued that because his interest was subject to divestment, he did not possess any property right subject to division prior to the interest vesting. Id. at 665. However, the court emphasized the fact that the benefits were subject to divestment under certain conditions did not reduce the husband's benefits to a "mere expectancy." Id. at 665 ; see also Nail v. Nail , 486 S.W.2d 761, 762 (Tex. 1972) ; Mora v. Mora , 429 S.W.2d 660, 662 (Tex.App.-San Antonio 1968, writ dism'd). The Cearley court noted that while pension benefits might not be payable until a certain date, they are not "earned" on that date. Cearley , 544 S.W.2d at 665. Rather, it is a form of deferred compensation which is earned during each month of military service. Id. The Cearley court went on to state that the portion that the husband earned during the months of coverture became contingent earnings of the community which may or may not bloom into full maturity at some future date. Id. at 665-66. It ultimately held that such rights, prior to accrual and maturity, constituted a contingent interest in property and a community asset subject to consideration along with other property in the division of the estate of the parties. Id. at 666.
Texas case law provides courts with formulas to help value retirement benefits upon divorce. See Berry v. Berry , 647 S.W.2d 945 (Tex. 1983) ; Taggart v. Taggart , 552 S.W.2d 422 (Tex. 1977). Each formula is dependent upon a benefit accrued during the marriage. The interest here is not a retirement benefit, and Wife failed at trial to introduce any instructive formula to establish a value of a contingent future interest similar to the Husband's PIUs in Logistics. Additionally, Husband, unlike the retirement interest in Cearley , has not contributed any community efforts during the marriage toward his contingent future interest in the PIUs. In other words, Husband did not accrue any benefit during the marriage to earn any interest in the PIUs. Therefore, Cearley is distinguishable from the facts of this case. We overrule Issue Two.
HARM ANALYSIS
In Issue One, the trial court's findings did not include the waste values attributed to either party. Accordingly, we determined that Wife was unable to show that error, if any, had more than a de minimis effect on the just and right division of the community estate because without that information, we are unable to know the value of waste each party committed relative to the entire community property estate. Similarly, in Issue Two, as discussed above, without an alternative valuation of Husband's PIUs reflected in the record, Wife also cannot illustrate harm. Accordingly, we conclude the trial court did not *230 abuse its discretion by finding: (1) that Wife committed waste and Husband's waste offset and otherwise negated Wife's waste; (2) and by valuing the Husband's Logistics' PIUs at $0.00 when the trial court was only presented with one value. See Wallace v. Wallace , 623 S.W.2d 723, 724 (Tex.App.-Houston [1st Dist.] 1981, writ dism'd). We overrule Issue Three and affirm the judgment of the trial court.
Hughes, J., not participating

As an example, we revisit the hypothetical we crafted in Lindsey v. Lindsey , 965 S.W.2d 589, 592 n.3 (Tex.App.-El Paso 1998, no pet.). Suppose the parties dispute the value of Husband's business which is operated as a sole proprietorship. Id. Wife contends it has a value of $30,000 while Husband values it at $10,000. Id. For purposes of this example, we will assume that Wife's valuation expert improperly includes personal good will. See Hirsch v. Hirsch , 770 S.W.2d 924 (Tex.App.-El Paso 1989, no writ) (Goodwill is not to be included or considered when placing a value on a professional corporation unless it can be determined first, that the goodwill exists independently of the personal ability of the professional person, and second, that if such goodwill does exist, it has a commercial value in which the community estate is entitled to share.). We will also assume that the trial court erroneously overrules Husband's objection and makes a specific fact finding that the business has a value of $30,000. Lindsey , 965 S.W.2d at 592 n.3. On appeal, Husband contends that the trial court erred in admitting Wife's expert's testimony, and had it been properly excluded, there was no evidence to support a valuation finding of $30,000. Id. While an appellate court would likely agree, that is merely the first hurdle. Id. Husband must still demonstrate that the trial court abused its discretion in dividing the community estate. Id. Even if the evidence is insufficient to support the court's value of $30,000, that valuation error may not constitute an abuse of discretion in the ultimate distribution of a $300,000 estate [the error representing ten percent of the total community estate], but it may well constitute an abuse of discretion in the division of a $100,000 estate [the error representing nearly a third of the community estate], depending upon the equities justifying a disproportionate division. Id.