COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



EJ MADISON, LLC,                        §

                    Appellant,          §          No. 08-17-00229-CV

v.                                      §          Appeal from the

                                                   205th District Court
PRO-TECH DIESEL, INC., A Texas          §
Corp.                                              of El Paso County, Texas
                                        §
                    Appellee.                      (TC# 2015-DCV2479)
                                        §

## **O P I N I O N**

Appellant, EJ Madison, LLC ("Madison") appeals from a take-nothing judgment after a bench trial in which it raised claims against Pro-Tech Diesel, Inc. ("Pro-Tech") for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets. In twenty issues, Madison asserts that the evidence was factually and legally insufficient to support the trial court's findings of fact and that it erred in its application of Texas law. Finding no error, we affirm the trial court judgment.

## BACKGROUND

In 2008, Madison, a trucking company, began doing business with Pro-Tech, a company that services and repairs trucks. In 2013, John Warren, the owner and manager of Madison, approached Ricardo Rivera, the owner and president of Pro-Tech with a business venture. Warren

told Rivera that Madison wanted to explore the feasibility of creating duel fuel conversion kits to convert its truck engines from diesel to ones that run primarily on natural gas. Warren considered Rivera a "diesel expert," and was interested in Rivera's input. Warren also wanted Pro-Tech to install the conversion kits after they were developed.

After sharing the idea with Rivera, Warren presented a Non-Disclosure and Non-Circumvention Agreement ("Agreement"), which Rivera signed on behalf of Pro-Tech on February 25, 2013. The paragraph entitled "Non-Disclosure, Non-Use and Non-Circumvention" provided as follows:

> Pro-Tech shall: (a) keep EJM's Confidential Information in strict confidence: (b) protect it with the same degree of care as the Pro-Tech treats its own Confidential Information; (c) not, without the prior written consent of EJM, disclose or permit it to be disclosed to anyone other than the Pro-Tech's directors, officers, employees, agents or consultants who have a legitimate need to know the Confidential Information for the Pro-Tech to negotiate, participate in, or perform services with respect to the Projects; (d) will not use, and will not permit its directors, officers, employees, agents or consultants to use, the Confidential Information for any reason other than for the Project; and (e) not circumvent EJM in connection with the Confidential Information. In addition to any other relief that may be available to EJM, Pro-Tech hereby assigns to EJM the profits, benefits and/or proceeds obtained by Pro-Tech as a result of any use of the Confidential Information that is not authorized in writing by EJM and to keep and hold same in trust for EJM and to tender same to EJM upon EJM's request. Pro-Tech also hereby grants as security interest to EJM in all of Pro-Tech's equipment, accounts and general intangibles to secure Pro-Tech's obligations to EJM under this Agreement.

The Agreement defined Confidential Information as follows:

> [C]onfidential financial and business information concerning EJM's business plans, financing sources, sales, margins, profits, customers, marketing programs and plans, new product developments, contractual relationships, as well as proprietary information concerning product technology, software, trade secrets, product development, new product ideas, and new applications for existing products and technology. . . all written and electronic communications that are derived from, or contain, in whole or in part, Confidential Information, including spreadsheets, memoranda, correspondence, emails, and all other documents.

2

.                .                .

For purposes of this Agreement, Confidential Information will not include information which (i) is now or hereafter becomes, through no act or failure to act on the part of either Party, generally known or available to the public; (ii) was acquired by the receiving Party before receiving such Information from EJM and without restriction as to use or disclosure; (iii) is hereafter rightfully furnished to the Pro-Tech by a third party, without restriction as to use or disclosure; (iv) is required to be disclosed pursuant to law, provided the Pro-Tech uses reasonable efforts to give EJM reasonable notice of such required disclosure; (v) is independently developed by the Pro-Tech without the use of or reference to Confidential Information; or (vi) is disclosed with the prior written consent of EJM.

Next, the Agreement described the "Project" as follows:

Pro-Tech and EJM have entered into discussions with each other in connection with prospective business arrangements and/or opportunities involving the following commercial project: conversion of trucks, including without limitation, trucks owned by EJM/its related companies, from diesel powered operation to dual CNG [compressed natural gas] /Diesel powered operation (the 'Project').

Warren testified that he anticipated that, by installing the conversion kits, Pro-Tech would develop an expertise in the duel fuel technology that would benefit Pro-Tech's business. He further testified that the Agreement was necessary to protect Madison's intellectual property as well as its relationships with different potential customers or contracts involving the technology. At the time that Rivera signed the Agreement, he believed it applied only to the natural gas conversion kit project, and that it did not encompass the general maintenance and repair services that Pro-Tech had long been providing to Madison. Rivera testified that if the Agreement *had* applied to general maintenance and repair services, Pro-Tech would not have entered into the Agreement. After Rivera signed the Agreement, Pro-Tech installed the conversion kits that were developed by Madison on Madison's trucks.

On August 22, 2013, Madison and EL Hollingsworth & Company, Inc. signed a separate Confidentiality and Non-Disclosure agreement, which indicated the parties were in the process of

3

"evaluat[ing] a proposal, negotiat[ing] an agreement, and/or perform[ing] an agreement." According to Warren, EL Hollingsworth, which is another trucking company, was originally interested in acquiring conversion kits for its own trucks. However, after Madison disclosed what they were doing, instead of purchasing and installing the conversion kits for EL Hollingsworth's own trucks, it became a financial partner with Madison by investing in the company and committing to purchasing conversion kits in the future. But EL Hollingsworth never honored that commitment.

In addition, by July 2014, EL Hollingsworth assumed operation of Madison's trucking company, including the trucks that were converted to the dual fuel system. According to Warren "it was basically decided that [EL Hollingsworth] would – you know, they would run the fleet of the trucks. We would take care of the technology. We were just doing what everybody was best suited to do." According to Rivera, Warren wanted to "step out of the – out of the trucking company" so he could focus on the technology. So, Warren approached Rivera to discuss the idea of Pro-Tech continuing the maintenance program once EL Hollingsworth assumed operation of Madison's trucks. In this regard, Rivera testified as follows:

> The Court: But how was it communicated or what was the agreement, if there was one, that Pro-Tech would continue to do the maintenance as a means of just—of, you know, continuing the business?
>
> [Rivera]: There was---it was a verbal agreement, ma'am. There was no really -- like I said, we were all partners. So it made perfect sense at the time that the transition—and especially on John's behalf because he wanted to step out of the – out of the trucking company. So it was an easy transition and it was a –I'm lost for words. But it was an –it was an attractive offer for EL Hollingsworth just to switch over the maintenance.
>
> Q: Why was that an attractive offer for Hollingsworth?
>
> A: Because it made—to them, they didn't have to go out and find a new repair shop.

4

They didn't have to go out and seek a new maintenance shop. For them it was just taking over the trucks.

.                    .                    .

The Court: What would have been the impact if you had at that point not worked on the trucks anymore?

A: They probably wouldn't have taken the deal because they would have had to start from scratch, and they probably would have had to find another, probably, location to maintenance the trucks, I would say. I mean, I'm not sure how—but I would say it wouldn't have a good impact on the transition between the both companies. It would have some type of a big effect on it.
Not—would it be enough to cause the deal to go south? I wouldn't be able to answer that, but I know it would have been some.

.                    .                    .

Q. Now within your personal knowledge, was Mr. Warren aware of the fact that you had provided this information or a summary of what the charges would be for maintenance to EL Hollingsworth?

A. Yes, because he -- I kept the same rate. I mean, the --I kept the same -- you know, me and John talked about it. He wanted me to keep the same rates, keep everything as the same because that's what he was pushing for.
And you know, his going rate at the time was only 68 bucks an hour. And due to the fact that we had been doing business for eight, nine years. So that's why his rate was so low. So when he introduced the idea to Hollingsworth—well, their average rate on the road is 100 bucks an hour, so 100 bucks an hour to versus 68 was an attractive offer.

Q: And to your knowledge, is that one of the reasons that Mr. Warren relied on that to move forward with that acquisition by EL Hollingsworth?

A. Sure. Because at that point, it was a win/win for everybody. You know, it was a win/win for Hollingsworth because they had a maintenance shop; as a diesel shop, it was a win for me; and it was a win for John because he passed over the trucks to Hollingsworth. So everybody at that time got what they wanted.

Rivera also explained the only thing that changed after EL Hollingsworth began operating the trucks was the "name on the bill." Thereafter, with Madison's knowledge and verbal consent, Pro-Tech continued to perform the same general maintenance it had been performing on the trucks

5

prior to 2013.

Meanwhile, Madison formed Clean Fuel Technologies ("CFT"), of which Rivera was a partner, and Clean Fuel Technologies II ("CFTII"), of which Clean Technologies was an owner. These companies focused on further developing the duel fuel technology. In addition, after July 2014, installation of the duel fuel system kits and related repairs were being performed by Pro-Tech through CFT.

By December 2014, the business relationship between Madison, EL Hollingsworth, and Pro-Tech soured. According to Warren, EL Hollingsworth began a "hostile takeover attempt" of the technology company and Pro-Tech aligned with EL Hollingsworth. According to Rivera, the technology company partners confronted Warren about "making bad business decisions without letting the partners know." Rivera said that as a result of these decisions, Pro-Tech was "spinning out of control in debt" because it "was not getting paid at the time." After Warren refused to make changes, Rivera instructed Pro-Tech to stop performing the conversion kit installations for CFT. In addition, following the split, Rivera believed the Agreement prohibited Pro-Tech from doing any work on the conversion kits, so it stopped working on them altogether. But, Pro-Tech continued to perform maintenance services, such as oil changes and tire and windshield wiper replacement on the trucks formerly owned by Madison that were being operated by EL Hollingsworth through trial.

On May 11, 2015, counsel for Madison sent Pro-Tech a demand letter accusing Pro-Tech of violating the Agreement by "enter[ing] into a commercial relationship" with EL Hollingsworth in July 2014 without Madison's written authorization. The letter sought "all of Pro-Tech's 'profits, benefits, and proceeds' arising from Pro-Tech's unauthorized use of the Confidential

Information."

Madison filed its original petition on July 27, 2015, and an Amended Petition on June 13, 2017. The Amended Petition raised the following claims: (1) Breach of Contract and Fiduciary Duty As to the NDNCA; and (2) Misappropriation of Trade Secrets.

Madison never sought injunctive relief. Instead, in addition to other damages, it sought recovery of all the gross proceeds received by Pro-Tech from July 2014 through trial, which Madison calculated at $721,789.07, and which Madison maintained would further increase for as long as Pro-Tech continued to perform maintenance work for EL Hollingworth. Following a bench trial on June 20, 2017, the trial court announced and explained its verdict from the bench. The trial court determined that Madison was not entitled to relief and eventually filed findings of fact and conclusions of law in support of its decision.

**STANDARD OF REVIEW**

A trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Howe v. Howe*, 551 S.W.3d 236, 249 (Tex.App.—El Paso 2018, no pet.). We determine whether a verdict is supported by the evidence by viewing the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller vs. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005); *see also Wheeling v. Wheeling,* 546 S.W.3d 216, 223 (Tex.App.—El Paso 2017, no pet.).

Moreover, here the trial court was the sole judge of the credibility of the witnesses and the weight to be given to their testimony and to the extent that conflicting evidence exists in this record,

7

we presume the trial court, as the sole trier of fact, resolved such conflicts in favor of the prevailing party. *City of Keller*, 168 S.W.3d at 819-20; *Wheeling*, 546 S.W.3d at 223. Indeed, as long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822; *Wheeling,* 546 S.W.3d at 223.

Conclusions of law are reviewed *de novo*. *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 322 (Tex.App.—El Paso 1995, writ denied); *Burnett v. Burnett*, No. 08-15-00339-CV, 2019 WL 2366963, *2 (Tex.App.—El Paso June 5, 2019, no pet.).

Appellant raises twenty issues challenging each and every adverse factual finding and conclusion of law entered by the trial court. Appellant's issues can be grouped into four categories: (1) Issues One, Two, Four, Five, Eleven, Fourteen, and Sixteen complain about the trial court's determinations as they pertain to Madison's breach of contract claim; (2) Issues Eight and Twelve relate to Madison's breach of fiduciary duty claim; (3) Issues Three, Six, Seven, Thirteen, Fifteen, Seventeen, and Eighteen relate to Madison's misappropriation of trade secrets claim; and (4) Issues Nine, Ten, Nineteen, and Twenty complain about the trial court's denial of attorney's fees and damages.[1]

## DISCUSSION

### Breach of Contract

The four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to

---

[1] Appellant's brief contains two issues that are numbered "V." The second one states: "The trial court erred by granting Appellee's Plea to the Jurisdiction that Appellant failed to bring suit in time." The record does not reflect a plea to the jurisdiction was made or granted. Because this issue appears to be added in error, we do not address it.

the plaintiff resulting from that breach. *Sanders Oil & Gas GP, LLC v. Ridgeway Elec*., 479 S.W.3d 293, 299-300 (Tex.App.—El Paso 2015, no pet.). A mere disagreement by the parties about the correct interpretation of a contract does not render it ambiguous. Rather, "[w]hen the disagreement between the parties is over the meaning of an unambiguous contract, the court must determine the parties' intent by examining and considering the entire writing." *Skinner Custom Homes, Inc. v. Smith*, 397 S.W.3d 841, 845 (Tex.App.—El Paso 2013, pet. denied).

"In determining the objective intent of the parties, we examine the entire instrument in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *Id.* Finally, we are to construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and we "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." [Internal quotations omitted]. *Frost Nat'l Bank v. L & F Distribs., Ltd*., 165 S.W.3d 310, 312 (Tex. 2005). If after the pertinent rules of construction are applied, the contract can be given a certain or definite legal meaning, then it is unambiguous and we construe it as a matter of law. *Skinner Custom Homes*, 397 S.W.3d at 845; *Frost Nat'l Bank*, 165 S.W.3d at 312.

### *Scope of the Agreement*

On appeal, Appellant argues that the trial court's interpretation of the Agreement's language, which excluded from the Agreement's scope Pro-Tech's use of EL Hollingsworth business relationship to perform general maintenance services without Madison's written authorization, was erroneous because it renders the following Agreement language meaningless:

> Pro-Tech . . . (d) will not use . . . the Confidential Information for any reason other than for the Project; and (e) not circumvent EJM in connection with the Confidential Information.

9

According to Appellant, Madison's general business relationship with EL Hollingsworth constituted "confidential information" and that this nonuse provision expressly prohibited Pro-Tech from using it for *any reason* outside the duel fuel conversion project. Appellant also claims that the non-circumvention language quoted above likewise prohibited Pro-Tech from generally circumventing Madison as to *any* business relationship with EL Hollingsworth.

Pro-Tech responds that the Agreement did not apply to any information unrelated to the conversion kit project. Rather, Pro-Tech maintains that the Agreement protected the business relationship Madison shared with EL Hollingsworth only to the extent it was related to the conversion kit project and that EL Hollingsworth's identity was only confidential to the extent it was tied to the conversion kit project. In support of its interpretation, Pro-Tech points to the description of the "Project" found in the recitals which limited the application of the Agreement to "prospective business arrangements and/or opportunities involving the following commercial project: conversion of trucks, including without limitation, trucks owned by Madison/its related companies, from diesel powered operation to dual CNG/Diesal powered operation ('the Project')."

We agree with Pro-Tech that the scope of the Agreement, read as a whole, was limited to the conversion kit project and did not prohibit the general truck maintenance services Pro-Tech was performing on trucks previously owned by Madison and later acquired by EL Hollingsworth. Because Appellant points us to no evidence in the record establishing that Pro-Tech was performing work related to the duel fuel conversion project after Pro-Tech stopped doing business with Madison, we overrule Appellant's points of error related to this claim.

In addition, we find further support for our holding in the definition of "Confidential Information," which expressly excludes:

10

> [I]nformation which (i) is now or hereafter becomes, through no act or failure to act on the part of either Party, generally known or available to the public; (ii) was acquired by the receiving Party *before* receiving such Information from EJM and without restriction as to use or disclosure; (iii) is hereafter rightfully furnished to the Pro-Tech by a third party, without restriction as to use or disclosure. . . (v) is independently developed by the Pro-Tech without the use of or reference to Confidential Information . . . .   [Emphasis added].

This language contemplates that any information possessed by each party before entering into the Agreement was not confidential.  In addition, because Pro-Tech had been performing general maintenance on the trucks Madison owned before and after the agreement, such work was "independently developed" and did not fall within the definition of confidential information.  Moreover, at the time EL Hollingsworth took over Madison's trucks, it became a third party that rightfully engaged the services of Pro-Tech to continue the general maintenance Pro-Tech had been providing before the Agreement was executed.

### *Applicability of the Covenant Not To Compete Act*

Furthermore, Appellant's interpretation of the nonuse provision would render it unenforceable because it would constitute an unlawful restraint of trade or commerce.  *See* TEX.BUS.&COM.CODE ANN. § 15.05 ("Every contract . . . in restraint of trade or commerce is unlawful").  Appellant argues that the nonuse provision generally prohibits Pro-Tech from accepting *any* business from EL Hollingsworth without Madison's consent *in perpetuity*.  Such an interpretation in effect *forever* prevents EL Hollingsworth from engaging the services of the one entity that had serviced the trucks it acquired from Madison.  Pro-Tech argues that such an interpretation would make the Agreement subject to the Covenant Not to Compete Act and unenforceable as unreasonably broad.  Appellant responds by pointing out that Pro-Tech is not its competitor and therefore the Act does not apply.  While it is true that Pro-Tech is not a competitor

11

with Madison, the record suggests that EL Hollingsworth is.

Any Agreement that prohibits Pro-Tech from accepting business from Madison's competitor is a covenant not to compete. *See Marsh U.S.A., Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011)(treating a "Non-Solicitation Agreement" as a restrictive covenant subject to the Covenants Not to Compete Act in part because it prohibited Cook from "accepting business" from former and prospective clients); *see also Eden Hannon & Co. v. Sumitomo Trust & Banking Co*., 914 F.2d 556, 562 (4th Cir. 1990)(treating a Noncircumvention and Nondisclosure Agreement that prohibited Sumitomo from "independently pursuing lease transactions" for approximately three years as a covenant not to compete because it was "merely a twist on employment noncompetition agreements").

Under Texas law, since 2013, covenants not to compete are governed by the Covenants Not to Compete Act (Act). TEX.BUS.&COM.CODE ANN. § 15.50-.52. Consequently, in order for the nonuse provision to be enforceable, it would have to meet the requirements of the Act. A covenant not to compete is enforceable if it contains limitations as to time, geographical area, and the scope of activity that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. TEX.BUS.&COM.CODE ANN. § 15.50(a). If the covenant contains limitations that are not reasonable and impose a greater restraint than is necessary, then the Court "shall reform the covenant" to make them reasonable. TEX.BUS.&COM.CODE ANN. § 15.51(c). Once it reforms a covenant not to compete, a trial court cannot award damages for injuries incurred from violation of the covenant before it was reformed. *Id.*

Here, the evidence established that Pro-Tech was performing general maintenance work

with Madison's knowledge and without complaint from Madison between July 2014 and December 2014 while the trio were still working together. Madison's failure to object to Pro-Tech's use of EL Hollingsworth's business relationship during this time suggests Madison did not believe prohibiting such use was necessary to protect Madison's goodwill or other business interests with respect to the conversion project, which means that if the nonuse provision *had* prohibited that activity, the scope of the prohibition was unreasonably broad.

In addition, the nonuse provision did not have a time restriction, which likewise rendered it unreasonable. *See* TEX.BUS.&COM.CODE ANN.§ 15.51(c)(requiring limitations on time); *see also Central States Logistics, Inc. v. BOC Trucking, LLC*., 573 S.W.3d 269, 277 (Tex.App.—Houston [1st Dist.] 2018, pet. denied)("A covenant not to compete that extends for an indeterminable amount of time is not reasonable and, as a result, in not enforceable.")(*citing Cardinal Pers., Inc. v. Schneider*, 544 S.W.2d 845, 847 (Tex.App.—Houston [14th Dist.] 1976, no writ).

Accordingly, even if Appellant's interpretation of the nonuse provision was correct, in order for it to be enforceable, on these facts, going forward, it would have to be reformed to narrow its scope and to impose a time restriction. However, Madison never sought reformation in the trial court. Consequently, we are without authority to grant such relief here. This is an additional and alternative basis on which the trial court's judgment is affirmed. Accordingly, Appellant's Issues One, Two, Four, Five, Eleven, Fourteen, and Sixteen are overruled.

## Breach of Fiduciary Duty

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and

(3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach." *Fred Loya Insurance Agency, Inc. v. Cohen*, 446 S.W.3d 913, 919 (Tex.App.—El Paso 2014, pet. denied). Madison's amended petition alleged that Pro-Tech breached a fiduciary obligation imposed by the Agreement by "failing to turn over the profits, benefits and proceeds of its commercial relationship" with EL Hollingsworth. At trial, Madison established that EL Hollingsworth had paid Pro-Tech $212,290.91 in gross proceeds for the general maintenance work Pro-Tech performed between July 2014 and May 2015. Relying on the following language in the Agreement, Madison argued that it was entitled to those proceeds and all subsequent proceeds going forward:

> In addition to any other relief that may be available to EJM, Pro-Tech hereby assigns to EJM the profits, benefits and/or proceeds obtained by Pro-Tech as a result of any use of the Confidential Information that is not authorized in writing by EJM and to keep and hold same in trust for EJM and to tender same to EJM upon EJM's request. Pro-Tech also hereby grants as security interest to EJM in all of Pro-Tech's equipment, accounts and general intangibles to secure Pro-Tech's obligations to EJM under this Agreement.

At trial, Pro-Tech established that it made no profit doing business with EL Hollingsworth and actually lost money. Accordingly, Pro-Tech argued it received no profit, benefit and/or proceeds from the general maintenance work it performed for EL Hollingsworth. It is unnecessary to resolve this question. Because we concluded as a matter of law that the Agreement excluded the general maintenance work Pro-Tech performed on the trucks formerly owned by Madison, we also conclude that Pro-Tech was not required to assign to Madison any profits, benefits, and proceeds Pro-Tech earned by performing that work. Accordingly, we overrule Appellant's Issues Eight and Twelve related to this claim.

**Misappropriation of Trade Secrets**

14

Appellant's claim of misappropriation of trade secrets is controlled by the Texas Uniform Trade Secrets Act (TUTSA). The elements of misappropriation of trade secrets under TUTSA are: (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages. TEX.CIV.PRAC.&REM.CODE ANN. §§ 134A.002(1), (3), (6), 134A.004(a); *Morgan v. Clements Fluids South Texas, Ltd.*, No. 12-18-00055-CV. 2018 WL 5796994 (Tex.App.—Tyler 2018, no pet.). At the time that Appellant filed its suit, TUTSA defined trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) deprives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX.CIV.PRAC.&REM.CODE ANN. § 134A.002(6)(2016).[2]

Here, Appellant argues that "[t]here is simply no question but that EL Hollingsworth constituted [Madison]'s trade secret information (as its customer or potential customer)." Madison further claims that the fact that it waited until after Pro-Tech signed the Agreement to introduce it to EL Hollingsworth is evidence of Madison's reasonable efforts to protect this information. Madison also asserts that Pro-Tech was able to enter into business with EL

---

[2] An amendment to the definition of trade secret became effective on September 1, 2017. *See* Acts, 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 1. TUTSA now defines trade secret as: "all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." TEX.CIV.PRAC.&REM.CODE ANN. § 134A.002(6)(*eff.* Sept. 1, 2017).

15

Hollingsworth only *after* Madison introduced the two companies and that Pro-Tech derived an economic benefit from the introduction. This evidence is insufficient to establish that EL Hollingsworth's identity was a trade secret for purposes of TUTSA. *See eg. In re Bass*, 113 S.W.3d 735, 739 (Tex.2002)(setting forth Restatement of Torts's six-factor test to determine whether trade secret exists. Factors to be weighed include in part: (1) extent to which the information is known outside of his business; (2) the extent of the measures taken by him to guard the secrecy of the information; and (3) the ease or difficulty with which the information could be properly acquired or duplicated by others).

First, the trial court expressly found EL Hollingsworth was *not* Madison's customer. The record supports the finding. Warren testified that EL Hollingsworth did not purchase or install conversion kits on its own trucks. Rather, EL Hollingsworth became a partner in the conversion kit venture and took over the operation of the trucking company owned by Madison, which included the general maintenance services being performed by Pro-Tech. Although Warren testified that EL Hollingsworth committed to purchasing conversion kits in the future, there was no evidence presented that it ever did so.

Second, the trial court also concluded as a matter of law that EL Hollingsworth's identity was readily ascertainable by proper means such as trade journals, reference books or published material, and that EL Hollingsworth's identity was not substantially secret. In our view these conclusions of law are supported by the reasonable inferences drawn from the evidence that EL Hollingsworth was a trucking company publicly operating in the United States outside of Madison; and that because there is no evidence that Madison made efforts to keep EL Hollingsworth's identity a secret from others while it was operating Madison's trucks in El Paso. Indeed, like Pro-

16

Tech any other vendors or service companies previously doing business with Madison were necessarily informed that EL Hollingsworth took over Madison's trucking company and that billing should be sent to EL Hollingsworth. Once Madison transferred operation of the trucks to EL Hollingsworth, its identity was easily discoverable by anyone.

Finally, because Madison sought damages, in order to prevail on this claim, Appellant must demonstrate an injury caused by the alleged misappropriation, which Madison failed to do. TUTSA defines damages as "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." TEX.CIV.PRAC.&REM.CODE ANN. § 134A.004(a). At trial, Warren testified as follows:

> Q: Did EJ Madison lose any business that it would otherwise have from EL Hollingsworth because of the maintenance services that were provided?
>
> A: Yes. EJ Madison made an introduction to—one being very lucrative—to Pro-Tech. And we commonly made introductions of businesses to other businesses that were lucrative and we made money on them. That's the whole purpose of it. And I have—I have—every introduction that I've ever made that's been successful, I've made something from them; but I don't do introductions for free.

Madison's evidence of "actual loss" is purely speculative. There is no evidence establishing that either Pro-Tech or EL Hollingsworth would have agreed to pay Madison for the introduction, or that they would have paid Madison for its written authorization to enter into a commercial business relationship.

As discussed above, because the record is clear that Pro-Tech stopped doing any work on the conversion kits in December 2014 and that Pro-Tech merely continued to provide to EL Hollingsworth the same general maintenance services for which Madison had been paying Pro-Tech before the Agreement was executed, Madison cannot demonstrate it was damaged by Pro-Tech's use of any information it provided. Indeed, the record reflects Madison actually benefitted

17

from Pro-Tech's acceptance of business from EL Hollingsworth by ensuring a smooth operational transition of the trucks from Madison to EL Hollingsworth. For these reasons, we overrule Appellant's Issues Three, Six, Seven, Thirteen, Fifteen, Seventeen, and Eighteen related to this claim.

**Attorney's Fees/Damages**

Appellant asserts that the trial court erred in concluding as a matter of law that Madison was not entitled to attorney's fees under TEX.CIV.PRAC.&REM.CODE ANN. § 38.001 *et. seq.* or damages. Chapter 38 of the Civil Practices and Remedies Code allows recovery of attorney's fees in breach of contract cases: "A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX.CIV.PRAC.&REM.CODE ANN. § 38.001(8). However, the Texas Supreme Court has long held that attorney's fees are only recoverable under the statute if the litigant: (1) prevails on a breach of contract claim; and (2) recovers damages. *See MBM Financial Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009). Because Madison did not prevail on any of its claims, it was not entitled to attorney's fees or damages. We overrule Issues Nine, Ten, Nineteen, and Twenty.

**CONCLUSION**

Having overruled all twenty issues Appellant raised in this appeal, we affirm the trial court's judgment.

November 22, 2019

YVONNE T. RODRIGUEZ, Justice

Before Alley, C.J., Rodriguez, and Palafox, JJ.

18