

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| WILLIAM EGGEMEYER, DIANE EGGEMEYER, BO EGGEMEYER, and SHARYLAND DISTRIBUTION & TRANSMISSION SERVICES, LLC | § | |
| | § | No. 08-19-00002-CV |
| | § | Appeal from the |
| Appellants, | § | 112th Judicial District Court |
| v. | § | of Reagan County, Texas |
| CHARLES JACKSON HUGHES | § | (TC# 1855) |
| Appellee. | § | |

**O P I N I O N**

This appeal resurrects a property boundary dispute that George Tankersley and James Talley ostensibly settled in 1914. Their dispute was resolved with an agreement setting a common boundary based on the position of a fence, rock mounds, and several mesquite trees. Fast forward a century, and the respective properties are held by new owners, Appellants William, Diane, and Bo Eggemeyer (collectively the Eggemeyers) and Appellee Charles Hughes. The Eggemeyers are convinced that the remnants of a fence, which also appears on several old surveys, defines their property boundary. Conversely, Hughes relies on several rock monuments which mark section lines as the dividing boundary between the properties. The difference implicates the ownership of

1

approximately 90 acres.  After a bench trial, the trial court agreed with Hughes and awarded him the disputed land, along with some, but not all, of the attorney's fees that he sought.

The Eggemeyers challenge both the adverse decision on the merits and the attorney's fees awarded.  We find that the evidence is factually sufficient to support the trial court's judgment as to the property line and affirm that portion of the judgment.  The attorney's fee question requires that we remand that issue back to the trial court.

## I.  BACKGROUND

All the land at issue is in Reagan County.  Relevant here, Hughes is the current owner of approximately 575 acres of Section 7 and 715 acres of Section 8.  Hughes's lands are to the north and east of the Eggemeyers' property.  The Eggemeyers are the current owners of Sections 3 and 4.  Because a picture can be worth a thousand words, the following 1939 survey map shows the position of the respective properties.



The survey also depicts the disputed property line. The lower east-west line represents the section line dividing Section 7 from 4 and Section 8 from 3. Hughes claims this line defines the boundary between his and the Eggemeyers' holdings. There is a stone mound at the intersection of the section line dividing Sections 7 and 4 and Texas Highway 137 (not depicted on this survey map). There is another stone mound at southernmost intersection of Sections 7 and 8 and the northernmost intersection of Sections 3 and 4. Conversely, the Eggemeyers contend that the upper dashed east-west line labeled as a fence on the survey, follows an old barbed-wire fence and divides the Hughes and Eggemeyer properties. There are no stone mounds along the fence line.

On the ground, the fence line and section lines are almost 150 yards apart, and over the course of the two-mile boundary, place approximately 90 acres in dispute.[1] We adopt the parties' shorthand for that area as the "Disputed Acreage."

We can surmise that there was some dispute on the dividing line of these properties over a hundred years ago. At that time, George Tankersley owned Sections 7 and James Talley owned Section 4. The Reagan County deed records contain an agreement between the two that states it is the "mutual desire of said parties to permanently fix and settel [sic] the boundary line between their respective lands so that the matter may be forever settled and so that no uncertainty may exist with reference thereto." To accomplish that end, Tankersley and Talley described the boundary line with this verbiage:

> Commencing at a stake and a stone md. set under the present south fence of the G. W. Tankersley pasture as it now stands for the S.W. corner of said survey No. 7, and the N.W. corner of said Sur. No. 4, from which a mes. 6" bears Sotuh [sic] 85 E. 25 1/2 varas, a wide spreading mes. 6" bears S. 75 3/4 E. 49 varas;

---

[1] At trial, the parties also disputed about 3 acres along the north south boundary of Sections 3 and 28 (which Hughes also owns). No distinct arguments on that boundary have been raised on appeal and accordingly we do not address that aspect of the dispute. *See* TEX.R.APP.P. 38.1(i).

> Thence East with the fence line as it now stands 1900 varas to a stone md. set 8 varas East of the East bank of a branch and under said fence line, for the N.E. corner of said Sur. No. 4 and the S.E. corner of said Sur. No. 7.

The parties' briefing agrees that the abbreviation "md." stands for mound, and "mes." means a mesquite tree. A vara is a unit to measure distance.[2]

Tankersley's property passed through a series of deeds and is now part of the Hughes ranch. Talley sold his ranch to the Malones in 1930. Cynthia Malone, on her death, passed the ranch to Muriel Kile. Muriel gave it to Robert Kile and William Kile in 1975. The Kiles sold the ranch to Wayne and Wanda Jo Ables in 1990. In 2012, Wanda Jo Ables, widow of Wayne Ables, sold Sections 3 and 4 to the Eggemeyers, providing a deed that describes the Disputed Acreage.[3]

In 2013, Russ Eggemeyer met with Hughes to ask if he had any objection to the Eggemeyers placing a water well closer than the standard 660 feet setback from the property line as required by local water district rules. Russ Eggemeyer is Bo's brother, William and Diane's son, and while not an owner of any of the relevant lands, is a partner in the Eggemeyers' farming business. The conversation triggered the parties' different understanding of the actual property boundary. The Eggemeyers believed their land extended to the old fence. Hughes believed that the fence was placed off the property line, and likely done so because the terrain made placing the fence on the section line much more difficult.

Hughes and Russ Eggemeyer negotiated for a time. Hughes believed that Russ Eggemeyer agreed on behalf of the Eggemeyers that Hughes would construct at his expense a standard fence

---

[2] The "vara" in Texas resulted from the collision of Spanish and English measurement units. The legislature set the vara at 33⅓ inches. Act of June 17, 1919, 36th Leg., ch. 130, § 1 Tex. Gen. Laws. 232, 232 (revised 1925). Accordingly, 1900 varas is basically a mile. https://www.sizes.com/units/vara_texas.htm (last visited January 15, 2021).

[3] William, Diane, and Bo own different Sections, and would have distinct claims to portions of the Disputed Acreage. For the purposes of this appeal, however, their particular ownership interests are not germane to the issues raised, and we thus refer to all of Section 3 and 4 as collectively owned by the Eggemeyers.

along the section line, and Hughes would also reimburse the Eggemeyers for what they paid Ables for the Disputed Acreage. The terms of their discussions were documented in emails between Russ Eggemeyer and Hughes. William and Bo Eggemeyer, however, disclaimed that they ever agreed to any of these terms once they understood the amount of acreage at issue. They had in fact sold a small portion of land within the Disputed Acreage to an oil and gas exploration company and sold an easement over the Disputed Acreage to a pipeline company.[4]

Hughes then sued the Eggemeyers, asserting several claims in his last amended petition: (1) a trespass-to-try-title claim based on Hughes having fee simple in the Disputed Acreage; (2) a suit to quiet title based on the invalidity of the Eggemeyers' deed; (3) a declaratory judgment claim seeking affirmation that the 1914 Tankersley-Talley agreement is binding, and sets the section line as the true boundary line; (4) a breach of contract claim based on violation of the 1914 Tankersley-Talley agreement; (5) a trespass claim based on the Eggemeyers' activities on the Disputed Acreage; (6) fraud and misrepresentation claims premised on the Eggemeyers' statements and conduct during the pre-suit negotiations to resolve the matter. In addition to the other relief sought, Hughes sought his attorney's fees for prosecuting the suit.

The Eggemeyers answered and in addition to their denial of Hughes' claims, they affirmatively asserted an adverse possession claim based on their and their predecessors' open and notorious use of the Disputed Acreage. They also counterclaimed under theories of quiet title, trespass, and declaratory relief (seeking a declaration that the boundary line is the fence line).

After a bench trial, the trial court entered findings of fact and conclusions of law that were favorable to Hughes as to his ownership of the Disputed Acreage. Those findings included a

---

[4] Sharyland Distribution & Transmission Services, LLC was included as a party in the trial court's final judgment and in the notice of appeal. It filed a cross-claim against the Eggemeyers which has been severed into a separate lawsuit and by a rule 11 agreement will be resolved after this appeal is final. No mineral interests are involved in this appeal.

5

rejection of the Eggemeyers' adverse possession claim. However, the trial court failed to find for Hughes on his trespass, breach of contract, and fraud/misrepresentation claims. As discussed in more detail below, the trial court awarded approximately a third of the total attorney's fees that Hughes sought at trial. On appeal, the Eggemeyers raise two main issues, one challenging the findings awarding the Disputed Acreage to Hughes, and the second challenging the attorney's fee award. We take each in turn.

## II.  OWNERSHIP OF THE DISPUTED ACREAGE

The Eggemeyers challenge the trial court's adverse findings on the ownership of the Disputed Acreage, and the judgment that followed. Germane to that issue, the trial court made these findings of fact:

> 3.    [Hughes] owns the Disputed Acreage through a regular and superior chain of title from the sovereign.
>
> 4.    This is a dispute over the boundary line between the parties' lands. The boundary line between the parties' lands determines ownership of the Disputed Acreage.
>
> . . .
>
> 6.    The boundary lines between the parties' properties are marked by stone mounds or historical evidence thereof. The boundary lines between the sections are marked by stone mounds. The boundary lines between the parties' properties are the boundary lines between the sections.
>
> 7.    The northern/southern boundary between the parties' properties is the established section line running east-to-west between Sections 7, G.C. & S.F. R.R. Co. and 8, E.W. Walker, on the north and Sections 4, W.G. Bartlett and 3, G.C. & S.F. RR. Co. on the south.
>
> . . .
>
> 9.    The existing casual wire fence on [Hughes's] property does not mark the boundary line between the parties. The fence is in disrepair in some places and is not presently in a condition that would contain animals. It is not known who built the fence, when the fence was built, or for what purpose the fence was built. The court does not find credible any claim or evidence that the fence existing today marks the boundary lines between the parties.

6

10. The terrain and natural conditions of the land at the established section lines, which is also the boundary between the parties' properties, is such that it would make building a durable fence difficult and expensive.

11. In 1914, George W. Tankersley (predecessor to [Hughes]) and James A. Talley (predecessor to [the Eggemeyers]) recorded a boundary agreement in the Reagan County Deed Records. The Boundary Agreement marked the boundary between the parties as the line between the stone mounds located on the established section lines.

12. The stone mounds reflected in the Boundary Agreement and deed records remain present today and mark the established section lines and boundary lines between the parties' properties.

13. The established section lines have been clearly reflected in multiple surveys prepared over the years and there is no dispute as to the location of the established sections as reflected by those surveys.

14. The fence existing today does not mark the boundary between the parties' properties. The court does not find credible any claim or evidence that the fence existing today is the fence noted in the Boundary Agreement.

The Eggemeyers challenge these findings as inconsistent with the "totality of the evidence" which they claim places the Disputed Acreage in their chain of title. Based on this issue they seek a new trial. We construe the argument as a factual sufficiency challenge.

## A. Standard of Review

Findings of fact entered in a bench trial have the same force and dignity as that of a jury's verdict upon questions. *Hernandez v. Hernandez*, 547 S.W.3d 898, 900 (Tex.App.--El Paso 2018, pet. denied). And as such, a trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Howe v. Howe*, 551 S.W.3d 236, 249 (Tex.App.--El Paso 2018, no pet.). For a factual sufficiency challenge, we consider all the evidence admitted at trial. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We sustain a factual sufficiency challenge only when the evidence supporting the finding is so weak "as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Similar descriptors found in the case law include "manifestly unjust," "shock the conscience," "or

7

clearly demonstrated bias." *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019) *quoting*

*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

Moreover, we must respect that the trial court as the fact finder was the sole judge of the credibility of the witnesses and the weight to be given to their testimony; we presume the trial court resolved any conflicting evidence in favor of the prevailing party. *City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005); *Wheeling v. Wheeling*, 546 S.W.3d 216, 223 (Tex.App.--El Paso 2017, no pet.). Indeed, so long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822; *Wheeling*, 546 S.W.3d at 223.

## B. Discussion

In support of their sufficiency challenge, the Eggemeyers direct us to the highpoints of their argument below. The 1914 agreement expressly references a fence. And while no one is alive to testify about its origins, the current dilapidated fence appears in surveys as early as 1928, and additional surveys done in 1939, 1956, 1990, 2014 and 2017. When Talley sold his property to Cynthia Malone in 1930, the deed referenced the 1914 agreement and traced the northern boundary of Sections 3 and 4 as a fence line. The Malone ranch passed to the Kiles, and two Kile brothers filed affidavits in the property records claiming the Disputed Acreage had been owned by them since 1930. The deeds from the Kiles to the Ables, and then from the Ables to the Eggemeyers describe the Disputed Acreage as part of the lands being sold. Additionally, the Eggemeyers have paid the property taxes on the Disputed Acreage, (but Hughes similarly made that claim).

The Eggemeyers presented Bart Johnson, a licensed surveyor, as their expert witness. He testified that the fence line more closely follows the calls from the 1914 agreement than does the

8

section line.  For instance, the 1914 agreement references a "bank of a branch" (interpreted by Johnson to mean a watershed).  Johnson identified a draw that he believes corresponds to the branch described in the agreement.  The section line is some 330 feet from that draw, rather than 22 feet as referenced in the 1914 agreement itself.  Hughes challenged Johnson's conclusion, however, gaining a concession that Johnson began the project with the assumption that the fence line was the correct boundary line.  Johnson similarly agreed that there are no stone or pipe markers along the fence line, other than a car axle at or near one corner.  Conversely, there are stone mounds with pipe markers along the section line.

The Eggemeyers also focused on Hughes's chain of title.  They argue that the probate documents passing title for Sections 7 and 8 to Hughes use acreage numbers establishing that the Disputed Acreage was not included in the conveyance.  The acreage numbers from the probate document tie back into a warranty deed from Hughes's cousin, Carol Crews Carter, to his mother, Wanda Doss, that described the acreage conveyed in Sections 7 and 8 as that bounded by perimeter fencing.

The Eggemeyers' case, however, did not go unrebutted.  Hughes testified that he and his family long understood that the boundary between the Hughes Ranch and those adjacent properties is the established governmental section line and not the old fence line.  It is not unusual for fences on West Texas ranches to be built off the property lines.  That is particularly true, as here, when the terrain dictates the placement of a fence.  This particular fence is located on a flat two-mile stretch, while the land along the section lines is rocky, has undulating hills, and a 150-foot-wide draw in the middle.

Hughes defended his own title to the Disputed Acreage and challenged the Eggemeyers.  In 1981 Carol Crews Carter received title to the entirety of Section 8 and all of Section 7 lying east

9

of State Highway 33 through a prior agreed judgment. That transfer would include the Disputed Acreage. And in addition to the Carter-to-Doss warranty deed that the Eggemeyers focused on, Carter on the same day executed a separate quitclaim deed to Doss that conveys all of Carter's interests in Sections 7 and 8, and not limited to what was within the perimeter fencing. Accordingly, this later quitclaim deed conveyed the entirety of Sections 7 and 8 as effectually as a warranty deed. *See Leatherman v. Holt*, 212 S.W.2d 1004, 1005 (Tex.App.--Eastland 1948, no writ) (applying rule that a quitclaim deed conveys the title to land as fully and effectually as a deed purporting to convey the fee if the grantor holds good title); *Fidelity Lumber Co. v. Bendy*, 245 S.W. 981, 984 (Tex.App.--Beaumont 1922, writ dis'd w.o.j.) (when good title is shown in transferor, a subsequent quitclaim deed was "as potent to convey the title as would have been a general warranty deed"). Hughes also urges that any variance in acreage from the deeds is negated by the property descriptions. The number of acres stated in a title instrument "is the least reliable of all calls in a deed." *Stribling v. Millican DPC Partners LP*, 458 S.W.3d 17, 21 (Tex. 2015) (per curiam). Courts will instead look to the "more specific and therefore better" indicia of the parties' intent--such as the actual description of the property. *Id.* And Hughes admitted into evidence all the operative deeds from the sovereign to the present that describe the boundary lines of the Hughes Family Ranch as defined by the section lines.

Hughes also challenged the Eggemeyers' title claim. The 1930 Talley-to-Malone deed expressly references Sections 2, 3, 4, 5, 6 but not 7 or 8. A 1939 survey includes acreages for Section 3 (661.5 acres), Section 4 (650 acres), and the Disputed Acreage (90.2 acres). Ms. Malone's will (who acquired Sections 3 and 4 from Talley) bequeathed Sections 3 and 4, and in table to the will, includes the same 661.5- and 650-acre descriptions, but makes no reference to

the 90.2 acres out of Sections 7 and 8. And those same acreages are recited in a 1976 gift deed from W.C. Kile and Muriel Kile to William and Robert Kile.

Although both sides to this appeal contend that the evidence clearly supports their view, the fact finder was confronted a more challenging decision. Absent claims of adverse possession, which were rejected by the trial court (and not brought forward on appeal), the 1914 agreement controls the placement of the property boundary between the two properties. That agreement references a fence that starts at a corner marked by a mound of rocks. Yet no rock mound was identified at the corner or anywhere along the length of the current fence. Conversely, several rock mounds with metal pipe are still in existence that mark the corners of the respective sections, yet no evidence exists today to suggest that a fence ever ran along the length of the section lines. And after 100 years, no evidence of the mesquite trees that Messrs. Talley and Tankersley identified still exist.[5] The property and acreage descriptions gleaned from the various deeds over time might infer what the parties understood the 1914 agreement to mean, but they are not uniform and undisputed. Some deeds appear to describe the Disputed Acreage in the Eggemeyers' chain of title, but no deed expressly identifies that Eggemeyers own any portion of Sections 7 and 8. Ultimately the trial court as the fact finder appears to have agreed with Hughes's argument that the clearest indication of the boundary line that Tankersley and Talley agreed to, as reflected by their written agreement, starts with a rock mound on the section line at the west corner of Sections 4 and 7 and ends with a rock mound at the east corner of Sections 4 and 7. And there is evidence of those rock mounds today, and in several surveys over the last century. While the

---

[5] Given that the surrounding circumstances of the Talley-Tankersley agreement are lost to time, both parties offered deduced guesswork to explain the discrepancies in the physical evidence. The Eggemeyers' expert suggested that the starting point of the 1914 agreement now lies in the current highway (thus explaining lack of mound of rocks under the fence). Hughes speculates that the whole purpose of the 1914 agreement was to preserve the section line as the property line in anticipation of building the current fence off the property line.

question is much closer than the parties care to admit, we find the evidence to be factually sufficient to support the trial court's findings.

## III. ATTORNEY'S FEES

Hughes's counsel presented evidence of $440,000 in attorney's fees that were incurred in the filing and prosecution of the lawsuit. The fee claim was supported with the testimony of one of Hughes's attorneys and billing records that were redacted in part to preserve attorney-client privileged communications. The trial court awarded a portion of the claimed fees based on this fact finding:

> [Hughes] incurred reasonable and necessary attorneys' fees in the amount of $144,135.50 to prosecute claims for which attorneys' fees may be awarded. This amount constitutes a segregated portion of the total fees incurred by [Hughes] and represents only those fees for work pursuant to claims for which attorneys' fees may be awarded under Texas law.

The Eggemeyers make two challenges to the fee award. First, they claim that the only issue before the trial court that Hughes ultimately prevailed on was a trespass-to-try-title claim, for which attorney's fees are not recoverable. Hughes responds that his declaratory relief claim through TEX.CIV.PRAC.& REM.CODE ANN. § 37.001 et. seq. (UDJA) expressly allows for attorney's fees in boundary disputes, which is the core component of the trial court's decision. Second, the Eggemeyers argue that even if Hughes prevailed on some theory supporting a fee award, his suit includes several theories for which attorney's fees are not recoverable. And Hughes's trial evidence never segregated the recoverable portion of his incurred fees from the unrecoverable portion. Moreover, the Eggemeyers urge that the trial judge could not make that segregation calculation based on the evidence presented. We take each sub-issue in turn.

### A. Boundary Dispute or Trespass-to-Try-Title?

"Texas has long adhered to the American Rule with respect to awards of attorney's fees, which prohibits the recovery of attorney's fees from an opposing party in legal proceedings unless

12

authorized by statute or contract." *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013). Trespass-to-try-title claims are exclusively governed by statute, and that statutory scheme does not generally include a provision for the award of attorney's fees. *See* TEX.PROP.CODE ANN. § 22.001 et. seq. Accordingly, Texas does not permit attorney's fees for the prevailing party in a trespass-to-try-title suit. *See, e.g.*, *Kehoe v. Clouse*, No. 04-14-00151-CV, 2015 WL 1393535, at *5-6 (Tex.App.--San Antonio Mar. 25, 2015, no pet.) (mem. op.) (collecting cases).

Conversely, the UDJA permits a trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just." TEX.CIV.PRAC.& REM.CODE ANN. § 37.009. Given this discrepancy in available remedies, litigants have sometimes cast trespass-to-try-title cases as UDJA claims. *See Lile v. Smith*, 291 S.W.3d 75, 78 (Tex.App.--Texarkana 2009, no pet.); *see also Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 926 (Tex. 2013). That may have been the case in *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004), which prompted the Supreme Court to hold that a boundary dispute could not be resolved by means of a UDJA claim. Rather the trespass-to-try-title statute governed the parties' claims. But the legislature amended the UDJA in 2007 to specifically allow, notwithstanding the Property Code's trespass-to-try-title provisions, that a person could obtain declaratory relief to determine the proper boundary line between adjoining properties, when that is the sole issue concerning title to real property. TEX.CIV.PRAC.& REM.CODE ANN. § 37.004 (c): *see Heredia v. Zimprich*, 559 S.W.3d 223, 231 (Tex.App.--El Paso 2018, no pet.) (noting change in law in the wake of the *Martin* decision).

And while Hughes asserted a claim for trespass-to-try-title, he also asserted and prevailed on a claim under the UDJA to define the boundary of the properties. That latter claim brings us to the heart of the Eggemeyers' first argument on attorney's fees: this case presented a trespass-to-try-title dispute and not a boundary dispute. Fortunately, we have some guidance in distinguishing

13

the two.  A trespass-to-try-title action is a procedure by which competing claims to title or the right to possession of real property may be adjudicated.  *Rogers v. Ricane Enters., Inc*., 884 S.W.2d 763, 768 (Tex. 1994); TEX.PROP.CODE ANN. § 22.001(a) ("A trespass to try title action is the method of determining title to lands, tenements, or other real property.").  Yet there has long been some overlap with a boundary determination, because boundary "necessarily involves the question of title, else the parties would gain nothing by the judgment."  *Martin*, 133 S.W.3d at 267, *citing Freeman v. McAninch*, 27 S.W. 97, 99 (Tex. 1894) (stating that "if the issue of title . . . was not determined . . . it [would be] wholly unimportant where the boundary between the surveys was").  So, "[t]he proper test for determining if the case is one of boundary is as follows: If there would have been no case but for the question of boundary, then the case is necessarily a boundary case even though it might involve questions of title."  *Plumb v. Stuessy*, 617 S.W.2d 667, 669 (Tex. 1981).  In applying that test, we must look to the heart of the controversy.  *See Kehoe*, 2015 WL 1393535, at *2; *Lile*, 291 S.W.3d at 78.

We agree with Hughes that the heart of this dispute was a boundary dispute.  Hughes traced his title back to the sovereign, but the disputed trial issues all focused on the title and the actions of the predecessors in title after 1914--the date of the boundary agreement between Talley and Tankersley.  The stated purpose of that agreement was to settle the boundary for all time.  And the question for the trial court was then to apply the wording of that agreement against the monuments still in existence today and as evidenced over time.  True enough, the parties admitted into evidence the post-2014 deeds and their respective descriptions of the properties conveyed as they would have in a trespass-to-try-title case.  Some of that argument, however, was offered as providing an insight into how Talley applied the 1914 agreement.  If he conveyed the land up to the fence in 1930, that would be some indication that the existing fence was the same fence referenced in the

14

1914 agreement. But in sum, the 1914 boundary agreement is at the heart of how the subsequent deeds and surveys are read, and without the dispute over the application of the boundary agreement to the existing landmarks and those identified in the deed records, there would be no dispute to resolve. *See Stuessy,* 617 S.W.2d at 669 (test for boundary dispute is whether there would have been no case but for the question of boundary).

The several cases which the Eggemeyers rely upon are inapposite because at the core of each was a question of title that did not arise out of a boundary question. In *Lile v. Smith*, for instance, the receiver in a partition suit sold a parcel of land that included additional land described in the metes and bounds which it should not have. 291 S.W.3d at 78. When that discrepancy surfaced years later, the suit resolved the title to the additional land and was understandably deemed a trespass-to-try-title claim and not a boundary dispute. A similar situation arose in *Acrey v. Langston Land Partners, LP*, No. 11-14-00025-CV, 2016 WL 1725371, at \*7 (Tex.App.-- Eastland Apr. 29, 2016, no pet.) (mem. op.) where a transferor in a chain of title included an additional parcel of land that was not in their chain of title. As such, the dispute was not over the location of a boundary, "but rather involves rival claims to ownership of the subject property." *Id.* at \*7. The Eggemeyers also point us to *Kehoe v. Clouse*, but the issue in that case turned on who owned a sliver of land between two properties that was not included in either's metes and bounds description. 2015 WL 1393535, at \*2. In our own opinion in *Heredia v. Zimprich*, the majority concluded that the relaxed boundary dispute rules applied (and not the stricter trespass-to-try-title procedures) where the boundary line dispute arose because of conflicting surveys. 559 S.W.3d at 227, 231. A dissenting opinion disagreed based in part on the argument that the case also involved a correction deed secured by fraud. *Id.* at 241 (Palafox, J., dissenting). Moreover, the plaintiff in that case was required to connect his own title and the defendant's title "through complete chains

15

of title to their common source, then, from there, compare the respective chains of title and show which title was superior." *Id.* at 241 (Palafox, J. dissenting). The issue here, however, begins and ultimately ends with the 1914 boundary agreement.

We therefore overrule Issue Two to the extent it contends that Hughes can recover no attorney's fees because the trial court resolved a trespass-to-try-title claim, and not a boundary dispute.

## B. Proper Evidence of Segregation?

The Eggemeyers second sub-issue challenges the legal and factual sufficiency of the evidence to support the amount of the fee award. Hughes sought a total fee award of $440,000 but the trial court awarded $144,135.50. While we conclude that Hughes can recover attorney's fees under the UDJA, the record also shows (1) he asserted several claims for which he could not recover fees (trespass-to-try-title, quiet title, trespass, fraud/misrepresentation), (2) asserted claims that he failed to prevail on (breach of contract), and (3) defended against claims where the prevailing party is not entitled to fees (adverse possession). When proving up attorney's fees at trial, Hughes's attorney adamantly declined to segregate any portion of the fee between recoverable and unrecoverable theories.[6] The attorney did prove up and admit into evidence the various attorney's fee bills which include time entries describing the services rendered, except where they were redacted.

### 1. Applicable law

Under the UDJA, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX.CIV.PRAC.& REM.CODE ANN. § 37.009. By its terms, fee awards

---

[6] The attorney witness stated: "What I'm saying is that, in my view and in my opinion, the fees were so interwoven that they cannot and should not be segregated based upon the focus of the case which is the title issue upon which all other claims flow from."

are permissive and when awarded, must be "reasonable and necessary" as well as "equitable and just." *Id.*; *see also Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). "These statutory limitations are complimented by other limiting principles, such as segregation of fees." *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 919 (Tex. 2015). The reasonable and necessary requirements under the UDJA are questions of fact to be determined by the fact finder. *Ridge Oil Co., Inc. v. Guinn Investments, Inc.*, 148 S.W.3d 143, 162-63 (Tex. 2004). Because a fee award under the UDJA is discretionary, we ultimately review the award for abuse of discretion. *See Bocquet*, 972 S.W.2d at 21. But a trial court abuses its discretion in awarding fees under the UDJA if there is insufficient evidence that the fees were reasonable and necessary. *See id.*[7]

The party seeking recovery of attorney's fees carries the burden of proof to support the award. *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017). That proof, at a minimum, must include "evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). The proof must be sufficient to permit a court "to perform a meaningful review of their fee application." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 764 (Tex. 2012).

A party seeking attorney's fees has "always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). For a time, the Texas Supreme Court recognized an

---

[7] The statutory "equitable and just" requirements are questions of law for the trial court to decide and would be reviewed under an abuse of discretion standard. *Bocquet*, 972 S.W.2d at 21. The only issue raised in the Eggemeyers' sub-issue, however, attacks legal and factual sufficiency of the evidence supporting the reasonable and necessary requirement. The trial court's finding of fact does not suggest that the amount of the fee turned on equitable or justness criteria. Accordingly, we limit our review to the sufficiency of the evidence to support the fee award, and the interrelated question of whether segregation was required, and if so, does the evidence support a segregated fee amount.

17

exception to this rule when "the same set of facts or circumstances" were intertwined to the point of being inseparable. *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991). But because the application of that exception proved problematic, the court in *Tony Gullo Motors I, L.P. v. Chapa* modified the exception such that when a party incurs attorney's fees related solely for a claim on which those fees are unrecoverable, the party must segregate the recoverable from unrecoverable fees. *Chapa*, 212 S.W.3d at 313-14. In *Chapa*, the prevailing party asserted a DTPA claim (fees recoverable) and a fraud claim (fees not recoverable). By way of example, the court pointed out that the attorney's time in drafting the portion of the pleadings or the jury charge related to the fraud claim were not recoverable and had to be segregated. While those claims depended on the same facts, "that does not mean they all required the same research, discovery, proof, or legal expertise." *Id.* at 313. The court cautioned that courts should not require precise allocation of fees to one claim or another and agreed that some services (such as standard discovery, depositions of primary actors, discovery motions and hearings) might be necessary irrespective of the number of claims asserted. *Id.*[8] Nonetheless, "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313-14, (modifying *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991)).

---

[8] The court also suggests that an opinion by the sponsoring witness as to the percentage of fees in the absence of the non-recoverable claim would have sufficed. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311, 314 (Tex. 2006).

18

## 2. *Segregation is required*

Here, no serious argument is advanced that segregation of the fees can be avoided. Some of the trial transcript is devoted to the adverse possession claim for which attorney's fees are not recoverable. That testimony, for instance, included multiple witnesses who testified on the placement and use of hunting blinds on the Disputed Acreage over the past several decades. None of that testimony, and the portions of the several depositions taken to advance those arguments, bolstered the UDJA claim or interpretation of the 1914 agreement. Another portion of the trial testimony addresses Hughes's conversations with Russ Eggemeyer as they related to a fraud/misrepresentation claim for which Hughes neither prevailed, nor would be entitled to fees in any event. These are but examples and compel the conclusion that Hughes was required to prove a segregated fee. *See Lindsey*, 526 S.W.3d at 427-28 (rejecting argument that fraud and UDJA claims were "inextricably intertwined" such that segregation was impossible); *Milliken v. Turoff*, No. 14-17-00282-CV, 2018 WL 1802207, at *3-4 (Tex.App.--Houston [14ht Dist.] April 17, 2018, no pet.) (mem. op.) (failure to segregate fees in boundary dispute from other claims for which fees were non-recoverable required remand of attorney's fee award.).

Hughes does not contest this point in his brief. Rather he contends the trial court could have determined the amount of the segregated fee on its own.

## 3. *The role of the trial judge*

All this brings us to the final issue in the case: can the trial judge as the fact finder make the allocation between recoverable verse non-recoverable fees in the absence of testimony or evidence on that issue? To be sure there, was no testimony on segregation. And while the record contains attorney's fee bills supporting the total fee, the majority of entries would not allow any obvious basis to segregate the recoverable from the unrecoverable. The subject of many entries is

redacted. *See Chapa*, 212 S.W.3d at 312 (noting problem of segregating when time entries are redacted); *McGibney v. Rauhauser*, 549 S.W.3d 816, 821 (Tex.App.--Fort Worth 2018, pet. denied) (remanding trial court's award of fees based on billing memos that "were so heavily redacted that the trial court could not possibly have had sufficient evidence to determine that the entire amount" was reasonable and necessary). Those entries which are not redacted do not provide a basis for determining what percentage of common time was allocated to the UDJA claim, or whether the time would have been incurred in any event. Hughes provides no analysis as to how the entries in the fee invoices could sustain the trial court's segregation of fees.

Hughes urges from the case law, however, that trial judges themselves can determine a usual and customary fee from the trial and the court's file. *See e.g.*, *Protect Environmental Services, Inc. v. Norco Corp.*, 403 S.W.3d 532, 543 (Tex.App.--El Paso 2013, pet. denied) ("[t]rial judges can draw on their common knowledge and experience as lawyers and as judges in considering the testimony, the record, and the amount in controversy in determining attorney's fees."); *see also McMahon v. Zimmerman*, 433 S.W.3d 680, 693 (Tex.App.--Houston [1st Dist.] 2014, no pet.) ("Trial courts are considered experts on the reasonableness of attorney's fees."). In particular, Hughes points to this Court's decision in *Alford v. Johnston*, 224 S.W.3d 291, 299-300 (Tex.App.--El Paso 2005, pet. denied). In *Alford*, the prevailing party in a contract and tort suit put on evidence of $5,000 in attorney's fees, but the trial court awarded only $2,000. Not satisfied with that reduction, the losing party claimed the plaintiff failed to offer any evidence on segregation. Rejecting that argument, this Court concluded that even if segregation was required, the trial court could have taken judicial notice of the proper fee.

Nonetheless, *Alford* and the other cases that Hughes relies on are not controlling. In *Alford*, the attorney's fee claim was based on a breach of contract where fees are allowed under

20

TEX.CIV.PRAC.& REM.CODE ANN. § 38.001. And under that chapter of the Texas Civil Practices and Remedies Code, a trial court is expressly authorized to take judicial notice of a usual and customary fee. *Id.* § 38.004 ("The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in . . . a proceeding before the court[.]"). The UDJA does not have a comparable provision. And Section 38.004 is limited to claims where fees are recoverable under Section 38.001. *See Coward v. Gateway Nat'l Bank of Beaumont*, 525 S.W.2d 857, 858 (Tex. 1975) (so holding under predecessor statute); *Hasty Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 503 (Tex.App.--Dallas 1995, writ denied) ("Section 38.004 only applies when a party seeks attorney's fees under section 38.001. When a claim for fees does not fall under section 38.001, the trial court may not take judicial notice of attorney's fees."). Several other cases relied on by Hughes similarly turn on judicial notice of a usual and customary fee in a Chapter 38.001 breach of contract claim. *See McMahon*, 433 S.W.3d at 689-94; [9] *Express One Int'l, Inc. v. Kitty Hawk Charters, Inc.*, No. 05-95-01741-CV, 1998 WL 261783, at \*3-5 (Tex.App.--Dallas May 26, 1998, pet. denied) (not designated for publication).

The Eggemeyers also point out that: (1) the cases allowing for the trial judge to segregate the fees mostly pre-date the 2006 change in law from *Chapa*; (2) a trial judge who segregates fees when a party who fails to would violate TEX.R.EVID. 605 by becoming a witness in the case;[10] and

---

[9] Hughes contends that *McMahon* supports the proposition that the trial court can segregate fees from a party's attorney fee invoices. In that case, the trial court made a specific fact finding that no more than three hours were incurred prior to trial on the claim for which fees were available. The court of appeals declined to remand the $6,000 fee award based on that fact finding and the ability of a trial court in a bench trial of a breach of contract claim to take judicial notice of a usual and customary fee pursuant to Section 38.004. As we note above, Section 38.004 is not applicable to this case, nor is there a fact finding of the number of segregated hours upon which to base a fee.

[10] Rule 605 provides, "The presiding judge may not testify as a witness at the trial. A party need not object to preserve the issue." TEX.R.EVID. 605. The Texas Court of Criminal Appeals in *Hammond v. State*, construed the rule to prohibit not only a judge's direct testimony, but also "the functional equivalent of witness testimony." 799 S.W.2d

21

(3) allowing the trial judge simply to find a segregated amount denies them meaningful evidentiary review of the fee award. On this record, we agree with the last point.

A litany of cases from the Texas Supreme Court illustrates the importance of allowing for the meaningful review of appropriate fee award. *See Rohrmoos*, 578 S.W.3d at 498 (disapproving of court of appeals decisions that uphold fee awards based on the generalities of an attorney's experience, the total amount of the fee, and the claimed reasonableness of that fee); *Long v. Griffin*, 442 S.W.3d 253, 253 (Tex. 2014) ("This Court has made clear that a party choosing the lodestar method of proving attorney's fees must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application."); *El Apple*, 370 S.W.3d at 763-64 (while giving the trial court considerable deference, noting the "applicant must provide sufficient details of the work performed before the court can make a meaningful review of the fee request"). By extension, when the evidence at trial offers no methodology for segregating the fee, and the trial court as the fact finder then segregates the fees but does not explain the rationale, we are at a loss in performing any meaningful review of the award.

That being said, the fact that Hughes proved up his total fee disposes of the Eggemeyers' no evidence claim because "[u]nsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." *Chapa*, 212 S.W.3d at 314. As to Eggemeyers' factual sufficiency claim, however, we agree that there is nothing in our record that shows how the trial judge arrived at the segregation amount. The testimony offered no basis to do so. The billing statements do not provide an articulable method to do so. We therefore sustain Issue Two, but

---

741, 746 (Tex.Crim.App. 1990) (en banc); *see also In re T.T.*, 39 S.W.3d 355 (Tex.App.--Houston [1st Dist.] 2001, no. pet.) (holding trial court violated Rule 605 by admitting into evidence its own temporary order containing fact findings adverse to the defendant in a case to be decided by a jury). Given our rationale, we need not decide if Rule 605 was implicated here.

only to the extent that the record does not permit this Court to review the amount awarded to determine whether the trial court abused its discretion in its award of attorney's fees. *See Metal Bldg. Components, LP v. Raley*, No. 03-05-00823-CV, 2007 WL 74316, at *18 (Tex.App.--Austin Jan. 10, 2007, no pet.) (mem. op.) (similarly reversing award of attorney's fees when there was "nothing in the record that reveals how the trial court then arrived at the awarded amount" and the court of appeals was unable "evaluate the trial court's segregation analysis"). Based on this issue, we remand the case to the trial court for reconsideration with sufficiently detailed information for a meaningful review of the fees sought. *See Long*, 442 S.W.3d at 255; *Kinsel*, 526 S.W.3d at 427-28 (Tex. 2017). We express no view on whether the amount currently awarded is too high, too low, or may prove to be ultimately correct after the trial court conducts appropriate future proceedings.

## IV. CONCLUSION

We overrule Issue One and affirm the trial court's judgment as it pertains to the disposition of the Disputed Acreage. We overrule Issue Two to the extent it claims that attorney's fees and costs are not recoverable at all. We sustain Issue Two to the extent it seeks a remand for reconsideration of the amount of attorney's fees if they can be properly segregated.

JEFF ALLEY, Justice

January 28, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

23