

# NUMBER 13-21-00251-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF THE MARRIAGE OF CLIFFORD ALLEN STALLWORTH AND KIM ELIZABETH STALLWORTH

### On appeal from the 24th District Court of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Chief Justice Contreras**

Appellant Clifford Allen Stallworth appeals from the trial court's entry of a final decree of divorce from appellee Kim Elizabeth Stallworth (Keszler). By three issues, Stallworth argues that the trial court erred in its division of marital property. Specifically, Stallworth contends the trial court erred by characterizing two lots of land as Keszler's separate property and impliedly rejecting his claims for reimbursement and fraud on the

community. The trial court's errors, Stallworth avers, resulted in a division of property that was neither just nor right and "requires [a] complete reversal for redistribution." We reverse and remand.

## I. BACKGROUND[1]

Stallworth and Keszler married on May 2, 2016. On May 1, 2020, Stallworth filed his original petition for divorce from Keszler. On January 6, 2021, Keszler filed her original answer and a counterpetition for divorce, requesting a disproportionate share of the community estate for, among other things, "disparity of earning power." Stallworth filed an amended petition on April 20, 2021, which included a claim for reimbursement and requested a disproportionate share of the community estate, in part, for "wasting of community assets by [Keszler]," "reimbursement," and "actual fraud committed by [Keszler]." The trial court held a bench trial on June 18, 2021, at which only Stallworth and Keszler testified. We summarize only the testimony relevant to the disposition of this appeal.

Stallworth testified that he began working in Odessa shortly after his marriage to Keszler, while Keszler remained at their home in Victoria. The pair shared a joint bank account (the Joint Account), into which Stallworth would deposit his paychecks. Stallworth noted that he and Keszler had an arrangement whereby Keszler would use funds from the Joint Account to pay the couple's bills. Stallworth rarely, if ever, checked the Joint

---

[1] Keszler filed an appellate brief that was untimely and did not comply with the rules of appellate procedure. The Clerk of this Court sent notices to Keszler on July 14, 2022, and August 15, 2022, requesting that she file, within ten days, a motion for leave to file her brief and a brief that complies with the rules of appellate procedure. As of the date of this memorandum opinion's issuance, Keszler has not filed a compliant brief to assist us in the resolution of this appeal.

Account statements, as they arrived by mail to the parties' home in Victoria, though he could have done so if he had chosen to.

The Joint Account statements were entered into evidence. Stallworth testified that, between June and December 2016, numerous transfers totaling $33,951 were made to an account ending in "3883"—which he surmised was Keszler's private bank account. Keszler's "Divorce Inventory Summary Sheet" in the record lists a personal account ending in "883" with a $1,605.24 balance.

Stallworth testified that, during the divorce proceedings, he learned that Keszler claimed three properties located in Boca Chica as her separate property—Lots 203, 204, and 205.[2] Keszler's inventory sheet lists the properties' worth at $6,000 each. The deed to Lot 205, admitted into evidence, was executed on November 14, 2016, and lists as the grantee "Keszler, a married person as her separate property." Stallworth testified that he and Keszler planned to purchase Lot 205 together and he put funds in the Joint Account for that purpose. But Stallworth noted he was neither present during the deed's execution nor knew that the deed ultimately listed Keszler as the sole grantee.

Keszler testified that she bought Lot 205 "all on [her] own," the deed is in her name only, and the deed states the property would be owned as her separate property. On cross-examination, Keszler confirmed that Stallworth "was not a part of [the Lot 205] transaction" but she testified that Stallworth had "seen all the paperwork" and that she

---

[2] Only Lot 205 is at issue in this appeal. Keszler bought Lot 204 before her and Stallworth's marriage, and Stallworth conceded at trial that Lot 204 is Keszler's separate property. While Stallworth argues on appeal that the trial court erroneously listed Lot 203 as Keszler's separate property, the record shows that Lot 203 was in fact listed as community property and was awarded to Keszler as part of her share of the divided community estate.

"didn't ever do anything without [Stallworth's] knowing." Keszler admitted that her testimony was the only proof she had that Stallworth knew about the deed. Indeed, Keszler conceded that all her claims for separate property were based entirely on her testimony and the deeds:

| | |
|---|---|
| [Stallworth's Counsel]: | In fact, your whole claim for separate property is solely based on your testimony, isn't it? |
| [Keszler]: | Yes. |
| [Stallworth's Counsel]: | There's no additional evidence that you've presented here today? |
| [Keszler]: | No. |
| [Stallworth's Counsel]: | So you would just like the Court to believe, based on your word, that these are your pieces of separate property? |
| [Keszler]: | Yes. |
| [Stallworth's Counsel]: | Okay. |
| [Keszler]: | And the deeds. |

Finally, Keszler confirmed that Stallworth "put money into the [J]oint [A]ccount . . . for [her] to pay bills with." When asked on direct examination whether it was "accurate" that she "frittered [money] away" from the Joint Account, she responded, "No."

Following the parties' testimony, the trial court rendered oral judgment in accordance with Keszler's proposed property division.[3] Concluding that it "could not consider evidence outside of the language on the deed pursuant[] to the parol evidence

---

[3] A document listing Keszler's proposed property division was purportedly handed to the trial court immediately prior to its rendition of judgment, but the document does not appear in the record.

rule" and, in any event, that Stallworth "has [not] overcome the presumption that the language in the deed is correct," the trial court concluded that Lot 205 belonged to Keszler as her separate property. The trial court also determined that Stallworth's total share of the community estate, as divided according to Keszler's proposal, was $76,085 and Keszler's was $12,521. Thus, "to equalize" the property division, the trial court awarded Keszler a $31,782 judgment from Stallworth. The trial court did not mention Stallworth's fraud or reimbursement claims regarding the $33,951 in transfers from the Joint Account into Keszler's private bank account. On July 6, 2021, the trial court and Keszler signed a final decree of divorce consistent with its oral judgment. Stallworth requested the trial court to issue findings of fact and conclusions of law, but it never issued any. This appeal by Stallworth followed.

## II.    DIVISION OF THE MARITAL ESTATE

### A.    Standard of Review & Applicable Law

In a divorce decree, the trial court must order a division of the marital estate "in a manner that the court deems just and right, having due regard for the rights of each party." TEX. FAM. CODE ANN. § 7.001; *see Pearson v. Fillingim*, 332 S.W.3d 361, 362 (Tex. 2011) (per curiam). This "just and right" standard is the sole method the court uses to account for and divide community property upon divorce. *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998). "Such a standard may at times lead to a disproportionate division of assets and liabilities of the parties, depending on the circumstances that courts may consider in refusing to divide the marital estate equally." *Id.*; *see Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981) (listing non-exclusive factors a trial court considers in

an unequal division of the marital estate). Thus, the property division need not be equal, but there must be some reasonable basis for an unequal division of the property. *Murff*, 615 S.W.2d at 698–99; *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.). "Each spouse bears the burden to present sufficient evidence of the value of the community estate to enable the trial court to make a just and right division." *Kelly v. Kelly*, 634 S.W.3d 335, 348 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

We review the trial court's division of the community estate upon divorce for an abuse of discretion. *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (citing *Murff*, 615 S.W.2d at 698). A trial court has wide discretion in making a just and right division, and we presume the trial court properly exercised its discretion. *Banker v. Banker*, 517 S.W.3d 863, 869–70 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied) (citing *Handley v. Handley*, 122 S.W.3d 904, 907 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.)). The appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion. *Id.* at 870 (citing *O'Carolan*, 414 S.W.3d at 311); *Handley*, 122 S.W.3d at 907 ("[A] trial court's division of property that is manifestly unjust is an abuse of discretion."). "In an abuse of discretion analysis, legal and factual sufficiency are not independent grounds of error, but rather relevant factors in assessing whether the trial court abused its discretion." *Banker*, 517 S.W.3d at 869 (citing *Handley*, 122 S.W.3d at 907). "There is generally no abuse of discretion on grounds of insufficiency if some probative evidence supports the trial court's findings." *Id.* at 869–70; *see In re Marriage of Rice*, 96 S.W.3d 642, 649 (Tex. App.—Texarkana 2003, no pet.) ("If more than a scintilla of evidence exists

6

to support the lower court's finding, the legal sufficiency challenge fails."); *Henry v. Henry*, 48 S.W.3d 468, 473 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.").

Where, as here, the trial court does not "file findings in response to a proper and timely request, the court of appeals must presume the trial court made all the findings necessary to support the judgment." *Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam). "A party may rebut the presumption by demonstrating that the record evidence does not support a presumed finding." *Id.* "In determining whether some evidence supports the judgment and the implied findings of fact, it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (internal quotation marks omitted). "We must uphold the trial court's judgment 'on any legal theory before it, even if the court gives an incorrect reason for its judgment.'" *In re L.M.R.*, 644 S.W.3d 783, 786 (Tex. App.—Corpus Christi–Edinburg 2022, no pet.) (first quoting *Guar. Cnty. Mut. Ins. v. Reyna*, 709 S.W.2d 647, 648 (Tex. 1986); and then quoting *Miramar Petroleum, Inc. v. Cimarron Eng'g, LLC*, 484 S.W.3d 214, 217 n.2 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied)).

In Texas, "[c]ommunity property consists of the property, other than separate property, acquired by either spouse during marriage." TEX. FAM. CODE ANN. § 3.002. Separate property is defined as, among other things, "property acquired by the spouse during marriage by gift, devise, or descent." *Id.* § 3.001(2). "Property possessed by either

spouse during or on dissolution of marriage is presumed to be community property." *Id.* § 3.003(a). Further, "[p]roperty acquired in exchange for separate property becomes the separate property of the spouse who exchanged the property." *In re Marriage of Douthit*, 573 S.W.3d 927, 930 (Tex. App.—Amarillo 2019, no pet.) (quoting *Ridgell v. Ridgell*, 960 S.W.2d 144, 148 (Tex. App.—Corpus Christi–Edinburg 1997, no pet.)). To rebut the community property presumption, a party must prove the relevant property is separate property by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *see id.* § 1.001(b).

The party seeking to rebut the community property presumption must trace the assets on hand during the marriage back to property that is separate in character. *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975); *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.). The tracing process consists of "establishing the separate origin of the [relevant] property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Boyd*, 131 S.W.3d at 612. "[T]he burden of tracing is a difficult, but not impossible burden to sustain." *Latham v. Allison*, 560 S.W.2d 481, 484 (Tex. App.—Fort Worth 1977, writ ref'd n.r.e.). We resolve any doubt as to the character of the property in favor of the community estate. *Akin v. Akin*, 649 S.W.2d 700, 703 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e). In general, absent tracing of the funds, mere testimony that property was purchased with separate funds will not suffice to rebut the community property

8

presumption. *In re Marriage of Nash*, 644 S.W.3d 683, 697 (Tex. App.—Texarkana 2022, no pet.) ("Conclusory or uncorroborated testimony that funds are separate property is insufficient to rebut the community presumption, unless there is also evidence that traces the funds.") (cleaned up); *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.) ("[M]ere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption."); *Robles v. Robles*, 965 S.W.2d 605, 614 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (same).

"Although we begin with a community property presumption, a presumption of separate property arises where . . . the instrument of conveyance contains a separate property recital." *In re Marriage of Moncey*, 404 S.W.3d 701, 712 (Tex. App.—Texarkana 2013, no pet.) (cleaned up). A "separate property recital" is a recital in an instrument that, among other things, the property is transferred to a spouse as the spouse's separate property. *Stearns v. Martens*, 476 S.W.3d 541, 547 n.4 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Such a separate property recital negates the community property presumption and creates in its place a rebuttable presumption of separate property. *In re Marriage of Moncey*, 404 S.W.3d at 712–13; *Magness v. Magness*, 241 S.W.3d 910, 912–13 (Tex. App.—Dallas 2007, pet. denied); *Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App—El Paso 1999, no pet.); *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no writ).

When both spouses are party to the transaction, "there is good reason to presume the recitals in the deed to be true." *Hodge v. Ellis*, 277 S.W.2d 900, 904 (Tex. 1955).

9

Thus, "a spouse who is a party to a deed transaction may not introduce parol or extrinsic evidence to contradict the express recitals in the deed without first tendering evidence of fraud, accident, or mistake." *Seitz v. Seitz*, 608 S.W.3d 272, 278 (Tex. App.—Houston [1st Dist.] 2020, no pet.). "But the situation is otherwise when [one spouse] is not a party to the purchase." *Hodge*, 277 S.W.2d at 905. In such a situation, "the [nonparticipating spouse is] free of the parol evidence rule in proving the community nature of the transaction as against the separate property recitals in the deed." *Id.*; *see Weed v. Frost Bank*, 565 S.W.3d 397, 412 (Tex. App.—San Antonio 2018, pet. denied) (noting that the presumption created by a separate property recital is a "bursting bubble" presumption, meaning that "[a]ll a party 'must do to eliminate the presumption from the case is produce enough evidence so that a reasonable juror could find the non-existence of the presumed fact'") (quoting 1 STEVEN GOODE & OLIN GUY WELLBORN III, TEXAS PRACTICE: TEXAS RULES OF EVIDENCE § 301.2 (4th ed. 2016)). At that point, the burden shifts back to the participating spouse to prove the separate nature of the property. *Hodge*, 277 S.W.2d at 907; *see Weed*, 565 S.W.3d at 406. And we then evaluate the evidence as we "would in any other case." *Weed*, 565 S.W.3d at 414 (quoting *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993)).

In a divorce, a trial court will divide community property among the parties, but it cannot divest either spouse of his or her separate property. *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140–41 (Tex. 1977). "If the trial court mischaracterizes a spouse's separate property as community property and awards some of the property to the other spouse, then the trial court abuses its discretion and reversibly errs." *Kelly*, 634 S.W.3d

10

at 348 (quoting *Sharma v. Routh*, 302 S.W.3d 355, 360 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). On the other hand, "[i]f the trial court mischaracterizes community property as separate property, that property does not get divided as part of the community estate." *Id.* at 349. "If the mischaracterized property has value that would have affected the just and right division of the community estate, then the mischaracterization is harmful, and we must remand the entire community estate for a just and right division based upon the correct characterization of the property." *Id.* But "[i]f the mischaracterization of the property had only a *de minimis* effect on the just and right division, then we need not remand the case to the trial court." *Id.*

## B. The Trial Court Erred by Concluding Lot 205 is Keszler's Separate Property

By his first issue, Stallworth contends that "[t]he trial court erred as a matter of law by applying the improper legal standard for the determination of separate property regarding the [Lot 205], therefore the evidence is legally insufficient to support the court's finding."

There is no dispute that Lot 205 was purchased during Stallworth and Keszler's marriage. Barring any other considerations, the lot is thus presumed to be community property. *See* TEX. FAM. CODE ANN. § 3.003(a). Keszler testified that she bought the property with her own funds, but she failed to properly trace those funds to separate property to rebut the community property presumption. *See id.*; *In re Marriage of Nash*, 644 S.W.3d at 697. However, the deed to Lot 205 includes a separate property recital listing the grantee as "Keszler, a married person as her separate property." That recital negated the community property presumption and created a rebuttable presumption that Lot 205 was Keszler's separate property. *See In re Marriage of Moncey*, 404 S.W.3d at

11

712–13.

To rebut the separate property presumption, Stallworth testified that he did not know that Lot 205 was purchased in Keszler's name only and was not present during the deed's execution. In fact, Keszler herself testified that Stallworth "was not a part of [the Lot 205] transaction" and that she purchased the property "all on [her] own." Further, Stallworth stated he believed Lot 205 would be purchased as community property using community funds that he deposited into the Joint Account. While Keszler noted that Stallworth was generally aware of the Lot 205 deed, even if true, Stallworth's mere knowledge of the deed's existence does not alone support a finding that he was a party to the transaction or consented to Keszler's purchasing of Lot 205 as her separate property with community funds. *See Ad Villarai, LLC*, 519 S.W.3d at 135; *Worford*, 801 S.W.2d at 109; *Hodge*, 277 S.W.2d at 904–06 (holding that although he "knew generally about the purchase of each property," "[s]ince [husband] signed no papers in connection with either purchase transaction, it seems impossible to reject, as a matter of law, his testimony, however 'thin,' that he had no detailed knowledge of the deeds"); *Weed*, 565 S.W.3d at 409 ("While there is evidence [wife] was aware in general of the transactions, it is undisputed that she did not participate in any negotiations with respect to the oil and gas interests or sign any documents relating to them. Thus, we conclude the record reflects that she was not a party to any of the deed transactions."). Based on the facts here, we conclude that Stallworth was not a party to the execution of the Lot 205 deed and was thus "free of the parol evidence rule in proving the community nature of the transaction as against the separate property recitals in the [Lot 205] deed." *See Hodge*,

12

277 S.W.2d at 905; *see also Weed*, 565 S.W.3d at 406.

Stallworth presented evidence of the community nature of Lot 205 in the form of testimony and bank account statements. Stallworth testified that he regularly deposited money into the Joint Account and once did so specifically for Keszler to buy Lot 205 as community property. Stallworth also admitted evidence showing that Keszler transferred $33,951 from the Joint Account in the first few months of their marriage into her own private account around the same time she purchased the three lots in Boca Chica. This evidence was uncontroverted. Further, there is no testimony concerning other potential personal sources of funds or income from which the capital to purchase Lot 205 could have come. *See Hodge*, 277 S.W.2d at 906–07 (holding that, among other things, "the absence of evidence as to other separate property that might have been employed" to purchase certain real property was evidence "that some of the community type [funds] went into the purchases"); *In re Marriage of Nash*, 644 S.W.3d at 705 (noting, in part, that the lack of tracing of disputed property allowed the factfinder to conclude the property was of the community variety). Indeed, the record provides no income or employment history for Keszler after 2013—three years before her purchase of the lots—and no personal financial statements from the period during which she purchased the lots. Based on this evidence, we conclude that a reasonable factfinder could have determined that Stallworth rebutted the separate property presumption of Lot 205. *See* TEX. FAM. CODE ANN. § 101.007; *Weed,* 565 S.W.3d at 413, 414. Thus, the burden then shifted back to Keszler to prove the separate nature of Lot 205—an issue that we analyze as we "would in any other case." *See Weed*, 565 S.W.3d at 414. And, as noted, Keszler failed to provide

13

sufficient evidence in that regard, as she failed to trace the relevant funds used to purchase the lot. *See In re Marriage of Nash*, 644 S.W.3d at 697.

Because Keszler failed to provide sufficient evidence of Lot 205's separate nature, the trial court was without evidence on which to conclude the lot was Keszler's separate property. The trial court thus erred by declaring Lot 205 Keszler's separate property. *See Kelly*, 634 S.W.3d at 348. Accordingly, we sustain Stallworth's first issue on appeal to the extent he argues the trial court erred with regard to Lot 205.

## C.    The Trial Court Erred if it Rejected Stallworth's Claim for Fraud on the Community

By his second issue, Stallworth contends that "[w]hile the [trial] court did not expressly reject [his] reimbursement and fraud claims, it impliedly disposed of them when it agreed to divide the marital estate in accordance with [Keszler]'s proposed division." Stallworth argues that the trial court's implied "rejection of [his] claims for fraud and reimbursement [was] not supported by legally sufficient evidence" and thus the trial court "was without authority to overrule [his] claims for reimbursement and fraud on the community."

### 1.    Applicable Law

In dividing the parties' marital estate, a trial court may consider one spouse's waste or fraud in transactions involving community property. *See* TEX. FAM. CODE ANN. § 7.009; *Schlueter*, 975 S.W.2d at 589; *Wheeling v. Wheeling*, 546 S.W.3d 216, 225 (Tex. App.—El Paso 2017, no pet.). "A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse." *Wheeling*, 546 S.W.3d at 225; *see Loaiza v. Loaiza*, 130 S.W.3d 894, 900 (Tex. App.—Fort Worth 2004, no pet.); *Zieba v.*

14

*Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (op. on reh'g). "The breach of a legal or equitable duty which violates this fiduciary relationship existing between spouses is termed 'fraud on the community,' a judicially created concept based on the theory of constructive fraud." *Wheeling*, 546 S.W.3d at 225 (quoting *In re Marriage of Moore*, 890 S.W.2d 821, 827 (Tex. App.—Amarillo 1994, no writ)). Although not actually fraudulent, fraud on the community has "all the consequences and legal effects of actual fraud in that such conduct tends to deceive the other spouse or violate confidences that exist as a result of the marriage." *Id.*

"A presumption of constructive fraud[, i.e., waste,] arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent." *Loaiza*, 130 S.W.3d at 901; *see Cantu v. Cantu*, 556 S.W.3d 420, 427 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Puntarelli v. Peterson*, 405 S.W.3d 131, 137–38 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "No dishonesty of purpose o[r] intent to deceive must be established; such proof of subjective intent is only required for actual fraud on the community, as opposed to constructive fraud on the community." *Puntarelli*, 405 S.W.3d at 138 (internal quotation marks omitted). Once the constructive fraud presumption arises, "the burden of proof is on the disposing party to show fairness in disposing of community assets." *Wheeling*, 546 S.W.3d at 225. "Evidence of a spouse using excessive funds without the other spouse's consent supports a waste finding." *Id.* As does "evidence of community funds unaccounted for by the spouse in control of those funds." *Id.* (citing *Puntarelli*, 405 S.W.3d at 139).

15

Upon determining that a spouse has committed fraud on the community, the trial court "shall (1) calculate the value by which the community estate was depleted as a result of the fraud on the community and calculate the amount of the reconstituted estate; and (2) divide the value of the reconstituted estate between the parties in a manner the court deems just and right." TEX. FAM CODE ANN. § 7.009(b); *see id.* § 7.009(a) (defining "reconstituted estate" as "the total value of the community estate that would exist if an actual or constructive fraud on the community had not occurred"); *id.* § 7.009(c) (listing three non-exclusive methods by which the trial court can award the wronged spouse a just and right division of the reconstituted estate); *see also Puntarelli*, 405 S.W.3d at 138 ("A claim for the improper depletion of the community estate may be resolved by the trial court with an unequal division of the community estate, or a money judgment in order to achieve an equitable division of the estate.").

### 2. Analysis[4]

Stallworth contends that the trial court impliedly overruled his fraud claims, but that is not necessarily correct. As discussed in greater depth in § III, *infra*, the trial court could have found that Keszler committed fraud on the community and still divided the marital

---

[4] There was some suggestion at trial that Stallworth failed to plead claims for fraud and reimbursement. However, as noted, Stallworth's petition alleged he should be awarded a disproportionate share of the parties' community estate for, among other reasons, "wasting of community assets by [Keszler]," "reimbursement," and "actual fraud committed by [Keszler]." We conclude that Stallworth's pleading gave sufficient notice of his waste, fraud, and reimbursement claims against Keszler. *See* TEX. R. CIV. P. 45(b); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000) ("Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant."); *see also In re D.V.D.*, No. 05-17-00268-CV, 2018 WL 2316014, at *7 (Tex. App.—Dallas May 22, 2018, no pet.) (mem. op.) (finding fair notice of waste claim was given by wife's live pleading, which alleged that she "should be awarded a disproportionate share of the parties' estate for the following reasons, including but not limited to . . . wasting of community assets by [husband]").

estate as it did, provided it had the necessary evidence to offset the fraud finding. *See Murff*, 615 S.W.2d at 698–99. But because we ultimately conclude it lacked such evidence, the trial court's ruling on Stallworth's fraud claim remains relevant to a decision of whether the trial court's potential error had greater than a *de minimis* effect on its overall property division. *See Kelly*, 634 S.W.3d at 348. We therefore analyze whether the trial court indeed erred in its implied fraud finding, assuming it found against Stallworth.

On appeal, Stallworth directs us to three cases concerning determinations that one spouse committed fraud on the community. *See Zeiba*, 928 S.W.2d at 789; *Massey v. Massey*, 807 S.W.2d 391, 402-03 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Reaney v. Reaney*, 505 S.W.2d 338, 340 (Tex. App.—Dallas 1974, no writ). In *Zeiba*, the court of appeals concluded that the trial court "abuse[d] its discretion by refusing to reimburse the community for . . . [various] expenditures and withdrawals." 928 S.W.2d at 790. In that case, there was testimony that the husband had withdrawn funds from a community account which he "fail[ed] to account for . . . at the time of the divorce." *Id.* There was also evidence that the husband spent over fifty thousand dollars on his paramour and "made little or no attempt at trial to explain or justify those expenses." *Id.* In *Massey*, the court of appeals affirmed the trial court's finding of constructive fraud given, in part, the husband's "fail[ure] to account for significant sums of money" expended on delineated loans and investments. 807 S.W.2d at 403. And in *Reaney*, the trial court found that "[a]t the time of trial, [husband] either still had the approximate sum of $53,000.00 in stock, securities[,] and cash in some form in his possession or under his control, or, in the alternative, [husband] squandered and/or dissipated same." 505 S.W.2d

17

at 339–40. There, the husband "testified that he squandered th[e] money, lost it and 'very imprudently went through' it; that he lost some of it gambling and that he gave some of it away; that he 'spent it very foolishly,' and that at the time of trial he did not have any of it." *Id.* at 340. The court of appeals affirmed the trial court's judgment, noting the husband's "admitted dissipation of approximately $53,000 of community assets was presumptively fraudulent" and that he "utterly failed to make any showing that the loss and dissipation of these community funds was not an abuse of his managerial powers" when "[t]he burden was on him to do so." *Id.*

The facts here are in part distinguishable because Keszler does not admit to transferring community funds into her separate account—and, necessarily, does not admit to spending those funds on any specific purchases. In other words, there is less clarity in this case as to the whereabouts and potential misuse of the relevant $33,951. But "[w]hile waste claims often are premised on specific transfers or gifts of community property . . . , a waste judgment can be sustained by evidence of community funds unaccounted for by the spouse in control of those funds." *Puntarelli*, 405 S.W.3d at 139; *see Cantu*, 556 S.W.3d at 427 ("Th[e fraud] presumption can arise not only by evidence of specific transfers or gifts of community assets outside of the community, but also by evidence that community funds are unaccounted for by the spouse in control of those funds."); *Puntarelli*, 405 S.W.3d at 140 (rejecting the husband's "argument that [wife] needed to identify specific transfers of community property (rather than indentifying unaccounted-for community funds in [husband]'s sole control) to shift the burden to [husband] to show the fairness of his use of those funds in his control").

18

As evidence of Keszler's alleged fraud on the community, Stallworth presented bank statements from his and Keszler's Joint Account showing $33,951 worth of transfers into Keszler's private account within the first seven months of their marriage, the same period when Keszler purchased the three lots in Boca Chica. Stallworth testified that he knew nothing about those transfers or their purposes and that he put money into the Joint Account for Keszler to pay the couple's bills. *See Wheeling*, 545 S.W.3d at 225. Notwithstanding the bank records, for her part, Keszler responded "no" when asked during her testimony if it was "accurate" that she "frittered [money] away" from the Joint Account. Keszler also stated that she used the Joint Account to pay bills but there is no testimony as to why she transferred over $30,000 into her private account to purportedly do so. *See id.*; *Puntarelli*, 405 S.W.3d at 139. And Keszler's "Divorce Inventory Summary Sheet" lists the balance of her bank account ending in 883 during divorce proceedings with substantially fewer funds than the amount transferred from the Joint Account. *See Puntarelli*, 405 S.W.3d at 140; *Zeiba*, 928 S.W.2d at 790; *Massey*, 807 S.W.2d at 403. These facts sufficed to shift the burden to Keszler to show fairness in disposing of community assets. *See Wheeling*, 546 S.W.3d at 225; *Puntarelli*, 405 S.W.3d at 140.

To reverse the trial court's judgment on legal sufficiency grounds as Stallworth requests, we would have to hold that the trial court abused its discretion because it lacked sufficient evidence to support its implied finding that Keszler did not commit constructive fraud on the community. *See Banker*, 517 S.W.3d at 869–70. Stallworth contends that his fraud claim remained uncontested throughout trial and so he rebutted the presumption that the trial court made the findings necessary to support a denial of his claim. *See Ad*

19

*Villarai, LLC*, 519 S.W.3d at 135. We agree. Stallworth presented sufficient evidence to shift the burden to Keszler to show fairness in her transfers of community funds to her private account under her sole control or, at the very least, to present any evidence or testimony that she did not misuse the funds. *See Puntarelli*, 405 S.W.3d at 140. But no conflicting evidence or testimony exists here to challenge Stallworth's contention. While Keszler denied that she "frittered" funds away from the Joint Account, she did not deny transferring funds into her separate account or using the funds, nor did she explain what she used those funds for, considering they do not appear in her account now. In the face of Stallworth's testimony, the Joint Account statements showing the transfers, and no conflicting evidence, the trial court was without discretion to discount Stallworth's claim for fraud on the community. *See Banker*, 517 S.W.3d at 869; *In re Marriage of Rice*, 96 S.W.3d at 649; *Henry*, 48 S.W.3d at 473.

We therefore conclude that the trial court lacked evidence to support a finding that Stallworth failed to prove his claim for fraud on the community. To the extent it did find as much, the trial court erred. We sustain Stallworth's second issue.[5]

### D. This Court Must Reverse and Remand for a New Division of the Parties' Marital Estate

By his third issue, Stallworth contends that this Court must remand for a redistribution of the community estate, given the potential that about $34,000 of community funds were improperly disregarded. Including the $33,951 of unaccounted-for transferred funds in the overall distribution of the marital estate, the trial court's division

---

[5] Given our conclusion on Stallworth's waste claim, we need not address the trial court's implied finding on his reimbursement claim. *See* TEX. R. APP. P. 47.1.

equates to approximately 36% to Stallworth and 64% to Keszler.

Under the "just and right" standard, the trial court's division of the marital estate need not be equal, but there must be some reasonable basis for an unequal division of the property. *See Murff*, 615 S.W.2d at 698–99. The trial court can consider myriad factors when deciding whether to divide the community estate in an unequal manner, including the spouses':

> (1) relative earning capacity; (2) relative business opportunities; (3) relative health and physical conditions; (4) relative financial conditions; (5) relative ages; and (6) education; as well as (7) the size of their separate estates; (8) the nature of the property; and (9) benefits the party not at fault would have derived from continuation of the marriage; and (10) the probable need for future support.

*Glenn v. Glenn*, No. 08-21-00059-CV, 2022 WL 3645070, at *4 (Tex. App.—El Paso Aug. 24, 2022, pet. filed) (citing *Murff*, 615 S.W.2d at 699). There is no threshold as to what percentage split between the spouses constitutes an unfair and unjust division and thus reversible error. *See Bradshaw v. Bradshaw*, 555 S.W.3d 539, 547 (Tex. 2018) (Devine, J., concurring). Thus, courts have affirmed marital estate divisions even when one spouse received more than eighty percent of the community property. *See, e.g., Ohendalski v. Ohendalski*, 203 S.W.3d 910, 912 (Tex. App.—Beaumont 2006, no pet.) (affirming award of 81% of the community estate to the wife); *Wright v. Wright*, 65 S.W.3d 715, 716 (Tex. App.—Eastland 2001, no pet.) (affirming award of 88% of the community estate to the wife).

Accordingly, the trial court could have found that Keszler committed fraud on the community and still divided the marital estate as it did, provided some probative evidence in the record existed to support an unequal division in favor of Keszler. *See Banker*, 517

S.W.3d at 869. The burden is on each spouse "to present sufficient evidence of the value of the community estate to enable the trial court to make a just and right division." *Kelly*, 634 S.W.3d at 348. Here, there is no evidence in the record supporting an unequal division of the marital estate in favor of Keszler. Indeed, it seems the trial court intended to order an exactly equal division of the parties' community property by awarding Keszler a $31,782 judgment to "equalize" the division. While she pleaded a claim for a disproportionate share of the community estate for "disparity in earning power," there is no testimony in the record concerning Keszler's employment status. Though Stallworth testified that he was employed and made $18 per hour, there is no evidence of Keszler's salary or hourly wages, or either parties' earning capacities. Nor is there evidence regarding their health conditions, fault in the divorce, or Stallworth's financial condition.

The trial court seemingly intended a 50%/50% division, but its error in rejecting Stallworth's fraud claim resulted in a 36%/64% division. Stallworth's half of the approximately $33,951 of potentially misclassified community property amounts to about 14% of the community estate. This amounts to more than a *de minimis* effect on the trial court's just and right division of the marital estate. *See Kelly*, 634 S.W.3d at 348; *McElwee v. McElwee*, 911 S.W.2d 182, 190 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (concluding that a mischaracterization of property valued at $45,000 that resulted in a 64%/36% division of property instead of the 61%/39% division intended by the trial court, had more than a *de minimis* effect on the trial court's just and right division); *see also Morris v. Veilleux*, No. 03-20-00385-CV, 2021 WL 4341967, at *9 (Tex. App.—Austin Sept. 24, 2021, no pet.) (mem. op.) (concluding that a mischaracterization of property

22

resulted in a 54%/46% division of property instead of the 51%/49% division intended by the trial court, had more than a *de minimis* effect on the trial court's just and right division).

We thus sustain Stallworth's third issue.

### III. CONCLUSION

We reverse the trial court's judgment and remand for further proceedings consistent with this memorandum opinion.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
2nd day of February, 2023.